MARSHA TOMLINSON v. BOARD OF EDUCATION
OF THE CITY OF BRISTOL
(14718)

PETERS, C. J., CALLAHAN, BORDEN, KATZ and PALMER, Js.

Argued April 27—decision released July 27, 1993

*Leon M. Rosenblatt,* for the appellant (plaintiff).

*Gregory T. D'Auria,* with whom were *Brian Clemow* and *Linda L. Yoder,* for the appellee (defendant).

KATZ, J. The principal issue in this appeal is whether the defendant, the Bristol board of education (school board), properly relied on two collective bargaining agreements between itself and the Bristol Federation of Teachers, Local 1464 of the American Federation of Teachers, AFL-CIO (Local 1464), in terminating the teaching contract of the plaintiff, Marsha Tomlinson, a tenured English teacher, as part of a work force reduction. The plaintiff appealed to the trial court, pursuant to General Statutes § 10-151 (f),[1] from the school board's decision to terminate her teaching contract. The trial court affirmed the school board's decision and dismissed the appeal.

The plaintiff appeals from the judgment of the trial court, claiming that the school board illegally terminated her contract because: (1) the school board violated one of the agreements, referred to as Project Pride, and therefore could not rely on it as a basis for her termination; (2) open teaching positions for which she was qualified existed in the English as a Second Language (ESL) program at the time of her termina-

---

[1] General Statutes § 10-151 (f) provides: "Any teacher aggrieved by the decision of a board of education after a hearing as provided in subsection (d) of this section may appeal therefrom, within thirty days of such decision, to the superior court. Such appeal shall be made returnable to said court in the same manner as is prescribed for civil actions brought to said court. Any such appeal shall be a privileged case to be heard by the court as soon after the return day as is practicable. The board of education shall file with the court a copy of the complete transcript of the proceedings of the hearing held by the board of education or by an impartial hearing panel for such teacher, together with such other documents, or certified copies thereof, as shall constitute the record of the case. The court, upon such appeal, shall review the proceedings of such hearing and shall allow any party to such appeal to introduce evidence in addition to the contents of such transcript, if it appears to the court that additional testimony is necessary for the equitable disposition of the appeal. The court, upon such appeal and after a hearing thereon, may affirm or reverse the decision appealed from. Costs shall not be allowed against the board of education unless it appears to the court that it acted with gross negligence or in bad faith or with malice in making the decision appealed from."

tion; (3) the school board eliminated a high school ESL program to avoid retaining her in violation of public policy; and (4) the president of Local 1464 lacked apparent authority to execute the agreements because such apparent authority was dissolved when she contested the president's actual authority to the school board. We affirm the judgment of the trial court.

The following facts are undisputed. The plaintiff, a tenured teacher in Bristol, was certified to teach English, grades seven through twelve, and had been employed for twelve years by the school board. During the 1989-90 school year the plaintiff was a high school English teacher.

In the spring of 1990, the school board voted to reduce the number of teaching positions in the Bristol high schools' English departments. After waiting for voluntary resignations or retirements, the school board decided that layoffs were necessary to achieve the desired reduction in teaching staff. The school board subsequently selected the plaintiff for layoff pursuant to General Statutes § 10-151 (d).[2]

[2] General Statutes § 10-151 (d) provides: "The contract of employment of a teacher who has attained tenure shall be continued from school year to school year, except that it may be terminated at any time for one or more of the following reasons: (1) [i]nefficiency or incompetence; (2) insubordination against reasonable rules of the board of education; (3) moral misconduct; (4) disability, as shown by competent medical evidence; (5) elimination of the position to which the teacher was appointed or loss of a position to another teacher, if no other position exists to which such teacher may be appointed if qualified, provided such teacher, if qualified, shall be appointed to a position held by a teacher who has not attained tenure, and provided further that determination of the individual contract or contracts of employment to be terminated shall be made in accordance with either (A) a provision for a layoff procedure agreed upon by the board of education and the exclusive employees' representative organization or (B) in the absence of such agreement, a written policy of the board of education; or (6) other due and sufficient cause. Nothing in this section or in any other section of the general statutes or of any special act shall preclude a board of education from making an agreement with an exclusive bargaining representative which contains a recall provision. Prior to terminating a con-

On July 12, 1990, the school board notified the plaintiff by letter that it was considering termination of her teaching contract because of a reduction in the number of teaching positions. Pursuant to § 10-151 (d), the plaintiff requested, and the school board provided, a written statement of its reasons for selecting the plaintiff for possible termination.

In its letter, the school board stated that it was considering the plaintiff's termination, because, in accord-

tract, a board of education shall vote to give the teacher concerned a written notice that termination of such teacher's contract is under consideration and, upon written request filed by such teacher with such board within seven days after receipt of such notice, shall within the next succeeding seven days give such teacher a statement in writing of the reasons therefor. Within twenty days after receipt of written notice by the board of education that contract termination is under consideration, such teacher may file with such board a written request for a hearing. A board of education may designate a subcommittee of three or more board members to conduct hearings and submit written findings and recommendations to the board for final disposition in the case of teachers whose contracts are terminated for the reasons stated in subdivision (5) of this subsection. Such hearing shall commence within fifteen days after receipt of such request, unless the parties mutually agree to an extension, (A) before the board of education or a subcommittee of the board, (B) if indicated in such request or if designated by the board before an impartial hearing panel or, (C) if the parties mutually agree, before a single impartial hearing officer chosen by both parties. If the parties are unable to agree upon the choice of a hearing officer within five days after their decision to use a hearing officer, the hearing shall be held before the board or panel, as the case may be. The impartial hearing panel shall consist of three members appointed as follows: The board of education shall appoint one panel member, the teacher shall appoint one panel member, and those two panel members shall choose a third, who shall serve as chairperson. Within ninety days after receipt of the request for a hearing, the impartial hearing panel, subcommittee of the board or hearing officer, unless the parties mutually agree to an extension, shall submit written findings and a recommendation to the board of education as to the disposition of the charges against the teacher, and shall send a copy of such findings and recommendation to the teacher. The board of education shall give the teacher concerned its written decision within fifteen days of receipt of the written recommendation of the impartial hearing panel, subcommittee or hearing officer. Each party shall pay the fee of the panel member selected by it and shall share equally

ance with § 10-151 (d) (5), it was eliminating her position and there were no other teaching positions available for which she was qualified and to which she could be appointed.[3] The school board's letter explained further that § 10-151 (d) (5) permitted it to reduce positions and terminate the teaching contracts of affected teachers in accordance with the layoff procedure agreed upon by the school board and Local 1464.[4] The agree-

the fee of the third panel member or any hearing officer and all other costs incidental to the hearing. If the hearing is before the board of education, the board shall render its decision within fifteen days after the close of such hearing, and shall send a copy of its decision to the teacher. The hearing shall be public if the teacher so requests or the board, panel or subcommittee so designates. The teacher concerned shall have the right to appear with counsel at the hearing, whether public or private. A copy of a transcript of the proceedings of the hearing shall be furnished by the board of education, upon written request by the teacher within fifteen days after the board's decision, provided the teacher shall assume the cost of any such copy. Nothing herein contained shall deprive a board of education of the power to suspend a teacher from duty immediately when serious misconduct is charged without prejudice to the rights of the teacher as otherwise provided in this section."

[3] The body of the letter, signed by the school board's director of personnel, William White, stated:

"Dear Marsha:

I am in receipt of your letter dated July 13, 1990, requesting the reasons why the Board of Education voted to inform you that termination of your contract is under consideration.

The reason for such action is contained in Section 10-151 (d) (5) of the Connecticut General Statutes: 'elimination of the position to which the teacher was appointed or loss of a position to another teacher, if no other position exists to which the teacher may be appointed if qualified . . . '

This provision requires the Board to identify specific teachers for termination of employment in case of reduction in force in accordance with the layoff procedure agreed upon between the Board and the Bristol Federation of Teachers. Although I have previously explained to you the operation of this procedure over the telephone, I will be happy to review it with you in person if you like.

Please be assured this action does not reflect upon your experience and ability as a teacher in Bristol, and we look forward to your return to a teaching position as soon as staffing needs permit."

[4] General Statutes § 10-151 (d) (5) permitting the board to terminate teachers affected by a work force reduction provides in part that "determination of the individual contract . . . to be terminated shall be made in

ment in effect at the time of the plaintiff's termination (original agreement) used seniority as the determining factor for layoffs.[5]

At the time the school board selected the plaintiff for layoff, she was the least senior high school English teacher, with the exception of two tenured high school English teachers who taught in two special programs: Project Pride and Alternative Education. Despite the seniority system established in the original agreement, two additional agreements between the school board and Local 1464, entitled Agreements Concerning Project Pride (Project Pride agreement) and Agreement Concerning Alternative Education[6] (Alternative Education agreement), protected tenured teachers in the Project Pride and Alternative Education programs from layoff, involuntary transfer, or bumping by other teachers exercising their bumping rights.[7] On the basis of the Project Pride and Alternative Education agreements, the school board did not select one of the two less senior teachers for layoff and, instead, selected the plaintiff.[8]

accordance with . . . a provision for a layoff procedure agreed upon by the board of education and the exclusive employees' representative organization . . . ." In Bristol, that organization is Local 1464.

[5] Article 34:4.2 of the original agreement states in pertinent part that "[s]eniority shall be the determining factor in layoffs and involuntary transfers caused by layoffs (or to avoid layoffs)."

[6] The school board and Local 1464 negotiated the Project Pride and Alternative Education agreements pursuant to Article 2:2 of the original agreement that states: "This contract shall not be changed except by the mutual consent of the parties. Such mutually consented change shall be in writing."

[7] The Project Pride and Alternative Education agreements provide in pertinent part:

"Persons selected for Project Pride shall remain in the program and shall not be subject to layoff or involuntary transfer for the period of time that the pilot exists."

"Effective with the school year 1990-1991, persons selected for the Alternative Education Program shall remain in their positions and shall not be subject to layoff or involuntary transfers caused by layoffs or to avoid layoffs."

[8] Although the plaintiff had initially applied for the Alternative Education program, she subsequently withdrew her application and was not considered for the program.

Upon receiving the school board's letter, the plaintiff requested, pursuant to § 10-151 (d), a public hearing before an impartial hearing panel to determine whether grounds existed for her discharge. The plaintiff and the school board agreed to convene before a single member hearing panel, under a waiver of the statutory time limit for commencing the hearing.

Between August 31 and October 19, 1990, the hearing officer held a series of hearings at which he entertained arguments by both the plaintiff and the school board and received evidence. At these hearings, the plaintiff argued that: (1) the school board had violated the Project Pride agreement by failing to create two teams and, therefore, could not rely on it as a basis for her contract termination; (2) she had been illegally discharged under § 10-151 (d) because, at the time of her discharge, the school board had been improperly employing "tutors" in teaching positions for which she was qualified; and (3) the Project Pride and Alternative Education agreements were void because they had not been ratified properly by Local 1464 membership, in accordance with the constitution of Local 1464. During the hearings, the hearing officer precluded, as irrelevant, evidence the plaintiff offered to show that: (1) the president of Local 1464 lacked actual authority to bind Local 1464 to the Project Pride and Alternative Education agreements; and (2) the school board was employing "tutors" to do the work of "teachers."

On January 6, 1991, the hearing officer issued a written opinion containing his findings and conclusions. On the basis of his findings, the hearing officer concluded that the school board had lawfully selected the plaintiff for discharge pursuant to § 10-151 (d) and in accordance with valid agreements between the school board and Local 1464. Additionally, he rejected the plaintiff's claim that the school board had breached the

Project Pride agreement by not creating two Project Pride teams. Finally, he rejected the plaintiff's argument that, because the school board had been improperly using less senior tutors in teaching positions, she could not be discharged while tutors still worked.

At a public hearing on January 14, 1991, the school board considered the hearing officer's recommendation and, by a vote of six to two, discharged the plaintiff. The school board gave the plaintiff timely written notice of its decision. Pursuant to § 10-151 (f), the plaintiff appealed to the Superior Court from that decision.[9] The trial court affirmed the school board's decision and dismissed the plaintiff's appeal. The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c). Additional facts will be set forth hereinafter where pertinent.

When considering termination of a tenured teacher's employment contract, a school board "acts, like an administrative agency, in a quasi-judicial capacity . . . ." *Mauriello* v. *Board of Education,* 176 Conn. 466, 469, 408 A.2d 247 (1979); *Miller* v. *Board of Education,* 166 Conn. 189, 191, 348 A.2d 584 (1974). Consequently, on appeal from a school board decision, the proper scope of review is that applicable to administrative appeals.

The standard of judicial review of administrative agency rulings is well established. *Lieberman* v. *State Board of Labor Relations,* 216 Conn. 253, 261, 579 A.2d 505 (1990); *Board of Education* v. *State Employees Retirement Commission,* 210 Conn. 531, 540, 556 A.2d 572 (1989). "General Statutes § 4-183 (j), as amended to take effect July 1, 1989, permits modification or

---

[9] See footnote 1.

reversal of an agency's decision if substantial rights of the person appealing have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (1) [i]n violation of constitutional or statutory provisions; (2) in excess of the statutory authority of the agency; (3) made upon unlawful procedure; (4) affected by other error of law; (5) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or (6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion. As under the prior statute, [t]he [reviewing] court may not retry the case or substitute its judgment for that of the agency on the weight of the evidence or questions of fact. . . . Rather, an agency's factual and discretionary determinations are to be accorded considerable weight by the courts. . . . On the other hand, it is the function of the courts to expound and apply governing principles of law. . . ." (Citations omitted; internal quotation marks omitted.) *Lieberman* v. *State Board of Labor Relations,* supra, 262–63.

Thus, on review of a school board decision, "it is not the function of the trial court, nor of this court, to retry the cause. The defendant board is an administrative agency, although it acts in a quasi-judicial capacity. To render a decision, it must weigh evidence and reach conclusions. . . . The credibility of witnesses and the determination of issues of fact are matters within its province." (Citations omitted; internal quotation marks omitted.) *Conley* v. *Board of Education,* 143 Conn. 488, 492, 123 A.2d 747 (1956); *Gibson* v. *State Medical Examining Board,* 141 Conn. 218, 221–22, 104 A.2d 890 (1954).

More specifically, in reviewing the action of a school board pursuant to § 10-151 (f), the trial court's function "is to determine whether the board has acted illegally and not to substitute our judgment for

that of the board." *Rado* v. *Board of Education,* 216 Conn. 541, 555, 483 A.2d 102 (1990). Further, "[a] school board 'has discretion to accept or reject a recommendation from an impartial hearing panel,' though it is bound by the panel's findings of fact unless unsupported by the evidence." Id.; *Catino* v. *Board of Education,* 174 Conn. 414, 417–18, 389 A.2d 754 (1978).

Applying these principles to the facts before us, we conclude that the trial court properly determined that the factual findings and conclusions reached by the hearing officer are supported by the evidence and are legally correct. Accordingly, we affirm the judgment of the trial court and uphold the school board's discretionary decision to terminate the plaintiff's teaching contract.

I

The plaintiff first claims that the school board was not entitled to rely on the Project Pride agreement to justify her discharge because the school board had violated the agreement. The following additional facts are relevant to the disposition of this claim. At the October 19, 1990 hearing before the hearing officer, the plaintiff offered the testimony of the president of Local 1464 that, in the course of negotiating the Project Pride agreement, he had agreed to the establishment of two Project Pride programs, one in Bristol Eastern High School and one in Bristol Central High School. The president further testified that the two programs were part of the Project Pride proposal from its inception. The president also testified that it was his expectation that the Project Pride agreement would result in the establishment of one program in each of the high schools. Finally, the president testified that, as of the date of the hearing, only one program existed, at Bristol Central High School. The president's testimony was uncontroverted at the hearings.

In addition to the president's testimony, the Project Pride agreement was admitted into evidence.[10] The

---

[10] The Project Pride agreement stated in pertinent part:

"With regard to the implementation of the Project Pride pilot program, the Bristol Federation of Teachers and the Bristol Board of Education hereby agree to the following items:

"Team Leader

"There shall be one leader for each team in each school. Compensation shall be $1400 per year as per contract Schedule A-1.

"After the teams have been appointed, team members in each school shall participate with the principal in selecting one of them to act as team leader. The principal will make the final recommendation to the Superintendent for Board approval.

"Team Work Day

"The work day for Project Pride team members will be the same as for other teachers except that the twenty minutes obligation after school mentioned in Article 18:3 may be waived at the discretion of the teacher.

"Compensation For Program Planning

"Summer work shall be compensated at the rates indicated in Article 20:6.

"Planning Time

"Project Pride team members will be granted the following time for planning:

"one period per day released from supervisory duties during the school year 1990-1991

"release from regular curriculum work on Professional Development days to do Project Pride planning

"ten days in the summer of 1990

"ten days in the summer of 1991

"reasonable other time to be considered by the Board

"Team Design For Curriculum

"The Project Pride teams shall have the flexibility to design a scope and sequence for the ninth and tenth grade curriculum for the pilot program.

"At the end of the two year pilot, the Project Pride team's scope and sequence of any non-traditionally designed curriculum must fulfill generally the over-all scope and sequence required in the traditional curriculum.

"When the Project Pride team has developed the basic outline for the pilot curriculum, it will be reviewed by the respective department chairs and/or administration in the school. This review will also occur at appropriate intervals in the pilot program.

"It shall not be required that the team's curriculum design be identical for both high schools.

"Training For The Teams

"In-service training shall be provided for team members. The topics of training as well as the times and places for training shall be determined

Project Pride agreement provides that "[w]ith regard to the implementation of the Project Pride pilot program, the Bristol Federation of Teachers and the Bristol Board of Education hereby agree to the following items . . . [t]here shall be one leader for each team in each school." The agreement then sets forth a list of conditions relating to, among other things, the length of a team teacher's work day, team composition, and team training. Some of the subsequent sentences in the

after the teams have been selected. Such training shall be based on the various needs and backgrounds of those selected.

"Project Pride Team Visits To Appropriate School Sites

"Days provided for visitations to appropriate school sites shall not be counted in the individual teacher's four day per school year allotment. Further, these days shall be considered as days under the provisions of Article 8:1.2a.

"The parties shall develop a procedure for arranging for these visitations which shall take place during the planning year.

"Personnel For Project Pride Teams

"People who are selected for Project Pride will go to or remain at the high school for the period from September 1990 to June 1993. Seniority provisions are waived for these people to provide for this.

"At the end of the pilot period, Project Pride teachers will have the right to return, if they so desire, to their original assignment (same school/same department/reasonable distribution of courses) provided that the teachers have sufficient seniority for assignment in order of priority to the same position held at the time Project Pride began, if available, or to an equivalent position, if available, or to a position for which they are certified or certifiable.

"For purposes of this section 'if available' shall mean if vacant or held by a less senior teacher; 'same position' shall mean the position the teacher would have held if not a part of Project Pride; 'equivalent position' shall mean the same school for K-6 teachers and a position in the same general department for 7-12 teachers.

"Waiving of seniority provisions is contingent upon a teacher completing the three year term of the pilot. . . .

"Miscellaneous

"In the event of unanticipated problems in the implementation of the Project Pride pilot program, the parties shall meet to resolve such matters as expeditiously as possible.

"This three year pilot shall consist of a planning year (1990-91) with implementation during 1991-1993."

agreement refer to the plural "teams." The agreement also states that "[i]n the event of unanticipated problems in the implementation of the Project Pride pilot program, the parties shall meet to resolve such matters as expeditiously as possible."

From this evidence, the plaintiff argues that the school board failed to fulfill its promise under the Project Pride agreement because it set up only one Project Pride "team," at Bristol Central High School. The plaintiff further argues that, had the school board fulfilled its promise and established a second team, at Bristol Eastern High School, she would not have lost her job, because, as the only tenured teacher who was discharged in the work force reduction, she would have been eligible to teach on the second team. Thus, the plaintiff maintains that the school board cannot justify her discharge on the basis of a contract it refused to honor, and which, if it had been honored, would have prevented the plaintiff's discharge. Finally, the plaintiff argues that the hearing officer failed to carry out his responsibilities as hearing officer because he failed to consider fully whether the plaintiff's discharge was proceeding according to a valid collective bargaining agreement, namely, the Project Pride agreement. We reject the plaintiff's arguments.

As a threshold matter, we must address whether the plaintiff has standing to bring her claim for breach of the Project Pride agreement. "Standing is the legal right to set judicial machinery in motion. One cannot rightfully invoke the jurisdiction of the court unless [one] has, in an individual or representative capacity, some real interest in the cause of action, or a legal or equitable right, title or interest in the subject matter of the controversy." *Ardmare Construction Co.* v. *Freedman,* 191 Conn. 497, 501, 467 A.2d 674 (1983). If a party is found to lack standing, the court is without subject matter jurisdiction to determine the cause.

*Housing Authority* v. *Local 1161,* 1 Conn. App. 154, 157, 468 A.2d 1251, cert. denied, 192 Conn. 802, 471 A.2d 244 (1984). Further, "the court has a duty to dismiss, even on its own initiative, any [portion of the] appeal that it lacks jurisdiction to hear." *Sasso* v. *Aleshin,* 197 Conn. 87, 89, 495 A.2d 1066 (1985).

It is well settled that "one who [is] neither a party to a contract nor a contemplated beneficiary thereof cannot sue to enforce the promises of the contract . . . ." *Coburn* v. *Lenox Homes, Inc.,* 173 Conn. 567, 570, 378 A.2d 599 (1977); see also *Knapp* v. *New Haven Road Construction Co.,* 150 Conn. 321, 324, 189 A.2d 386 (1963). Under this general proposition, if the plaintiff is neither a "party" to, nor a contemplated beneficiary of, the Project Pride agreement, she lacks standing to bring her claim for breach of the agreement.

In the collective bargaining setting, however, we look to both the contract and the statute governing the proceedings under review to determine who constitutes a "party" to a collective bargaining agreement for purposes of standing. In *Paranko* v. *State,* 200 Conn. 51, 55, 509 A.2d 508 (1986), this court rejected the general proposition that, for purposes of standing, the only "parties" to a collective bargaining agreement are the employer and the union. We have also refused to analogize employee union members to third party beneficiaries. Id. We have recognized that, although employees may not take part individually in negotiating the collective bargaining agreement, employees nonetheless have an important role in labor negotiations and, therefore, may be considered "parties" to a collective bargaining agreement. Id. We have stated that "[t]he employees' interests are . . . represented by the agreement signed by the union on their behalf, and the agreement will often grant them the right individually to enforce certain provisions of the contract. They are in a broad sense, therefore, 'parties' to the agreement." Id.

*Paranko* addressed the narrow issue of whether, under the specific terms of a collective bargaining agreement between the state and an employee union, General Statutes § 52-410[11] grants an individual union member standing to bring an action to compel the state to submit to arbitration. Section 52-410 (a) provides in part: "A *party* to a written agreement for arbitration claiming the neglect or refusal of another to proceed with an arbitration thereunder may make application to the superior court . . . for an order directing the *parties* to proceed with the arbitration in compliance with their agreement." (Emphasis added.) Thus, our review was limited to whether the plaintiff, a state employee and an employee union member, was a "party" to a collective bargaining agreement within the meaning of § 52-410. *Paranko* v. *State,* supra, 55.

*Paranko* concluded that individual employees may be "parties" to a collective bargaining agreement for the

[11] General Statutes § 52-410 provides: "APPLICATION FOR COURT ORDER TO PROCEED WITH ARBITRATION. (a) A party to a written agreement for arbitration claiming the neglect or refusal of another to proceed with an arbitration thereunder may make application to the superior court for the judicial district in which one of the parties resides or, in a controversy concerning land, for the judicial district in which the land is situated or, when the court is not in session, to any judge thereof, for an order directing the parties to proceed with the arbitration in compliance with their agreement. The application shall be by writ of summons and complaint, served in the manner provided by law.

"(b) The complaint may be in the following form: '1. On . . . , 19 . ., the plaintiff and the defendant entered into a written agreement for arbitration, of which exhibit A, hereto attached, is a copy. 2. The defendant has neglected and refused to perform the agreement for arbitration, although the plaintiff is ready and willing to perform the agreement. The plaintiff claims an order directing the defendant to proceed with an arbitration in compliance therewith.'

"(c) The parties shall be considered as at issue on the allegations of the complaint unless the defendant files answer thereto within five days from the return day, and the court or judge shall hear the matter either at a short calendar session, or as a privileged case, or otherwise, in order to dispose of the case with the least possible delay, and shall either grant the order or deny the application, according to the rights of the parties."

purposes of § 52-410 if the collective bargaining agreement so provides because an individual employee has input in the contract negotiations through the union and has a clear interest in seeing the contract enforced. Consequently, we held that individual employees have standing as parties to enforce the arbitration provision of a collective bargaining agreement only if the agreement expressly gives them the right to seek arbitration of their grievances. Id., 56; see *Gaudet* v. *Safeco Ins. Co.,* 219 Conn. 391, 397 n.6, 593 A.2d 1362 (1991). If, however, the agreement is silent, we held that "[individual employees] are deemed to have ceded all such enforcement rights to their duly elected bargaining representative, which is, in effect, their enforcement agent." *Gaudet* v. *Safeco Ins. Co.,* supra; *Paranko* v. *State,* supra.

In this case, we must determine whether the plaintiff, an individual employee, has standing to enforce the Project Pride agreement, an amendment to the original collective bargaining agreement comprising her contract of employment. Article 34:3 of the original agreement between Local 1464 and the school board states: "It is understood that a layoff is a termination of employment subject to administrative and/or judicial review in the manner set forth in the subsections of Section 10-151 of the Connecticut General Statutes, as amended, and in no other manner. . . ." Under this language, a termination dispute is not governed by the terms and grievance procedures of the collective bargaining agreement, but rather, by the terms and procedures of § 10-151. Thus, unlike the circumstances in *Paranko,* where we looked to both the collective bargaining agreement and the statute governing the proceedings under review, in this case a determination of the plaintiff's rights is dependent solely upon an examination of § 10-151.

We conclude that, under § 10-151 (d), the plaintiff has standing to enforce the Project Pride agreement. Section 10-151 (d) states that a tenured teacher's contract of employment may only be terminated for certain stated reasons. Additionally, the section states that, if a tenured teacher is terminated for one of those reasons, the teacher has a right to a hearing to contest the termination. Implicit in this right to contest the termination, is the right to enforce the tenured teacher's underlying contract of employment. Indeed, it is only by virtue of the employment contract that the tenured teacher has any rights at all under § 10-151 (d). In this case, that employment contract is the plaintiff's collective bargaining agreement, inclusive of the Project Pride agreement. Consequently, we conclude that the plaintiff has standing under § 10-151 (d) to enforce the provisions in the Project Pride agreement.

Even though the plaintiff has standing to bring her claim for breach of the Project Pride agreement, her claim necessarily fails if the hearing officer properly concluded that the school board's failure to create a second Project Pride team did not constitute a breach of the Project Pride agreement. Resolution of this claim presents both questions of fact and questions of law turning on the hearing officer's interpretation of the agreement. Thus, our review of the claim requires us first to decide whether the trial court correctly determined that the factual findings by the hearing officer are supported by the evidence. *Rado* v. *Board of Education,* supra, 555. Then, our review requires us "to expound and apply governing principles of [contract] law." *Board of Education* v. *State Employees Retirement Commission,* supra, 540. Because we conclude that the hearing officer's interpretation of the Project Pride agreement is supported by the evidence and is legally correct, we reject the plaintiff's argument.

"A contract is to be construed as a whole and all relevant provisions will be considered together. . . . In giving meaning to the terms of a contract, we have said that a contract must be construed to effectuate the intent of the contracting parties." (Citations omitted; internal quotation marks omitted.) *Barnard* v. *Barnard,* 214 Conn. 99, 109, 570 A.2d 690 (1990). If the parties have reduced their agreement to a writing, their intent "is to be determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. The question is not what intent existed in the minds of the parties but what intention is expressed in the language used." (Internal quotation marks omitted.) Id., 110. Further, "[a] promise not expressly made will not be read into the contract unless it arises by necessary implication from the provisions of the instrument." *Ives* v. *Willimantic,* 121 Conn. 408, 411, 185 A. 427 (1936).

"In interpreting contract items, we have repeatedly stated that the intent of the parties is to be ascertained by a fair and reasonable construction of the written words and that the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. . . . Where the language is clear and unambiguous, the contract is to be given effect according to its terms." (Citations omitted; internal quotation marks omitted.) *Barnard* v. *Barnard,* supra, 110.

Application of these principles to the evidence in this case supports the hearing officer's interpretation of the Project Pride agreement. That evidence consisted of: (1) the testimony of the Local 1464 president with respect to his expectations concerning the agreement prior to its signing; and (2) the language of the Project Pride agreement itself. Where, as here, the parties have reduced their agreement to a writing, their intent "is

to be determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction." (Internal quotation marks omitted.) Id. Most important, "[t]he question is not what intent existed in the minds of the parties but what intention is expressed in the language used." (Internal quotation marks omitted.) Id.

The language of the Project Pride agreement does not require the creation of two teams, and the hearing officer properly refused to read into the agreement such "[a] promise not expressly made" when it does not arise "by necessary implication from the provisions" of the agreement. *Ives* v. *Willimantic,* supra, 411. Although the agreement frequently refers to the plural "teams," nowhere in the agreement is it stated that the school board must establish two teams. The agreement merely governs the conditions under which each established team is to be operated. The operative word in the first sentence is "implementation," indicating that the list of conditions that follows relates only to the means the board must employ in establishing a team. Thus, the statement contained in the agreement following the first clause stating that "[t]here shall be one leader for each team in each school" means nothing more than what it says: for each team that the school board establishes, there shall be one leader. Such an interpretation is supported by one of the last sentences in the agreement, where again, reference is made to the "implementation" of the Project Pride program. Thus, construing the agreement "as a whole," and considering all relevant provisions together, the hearing officer's interpretation of the agreement represents a "fair and reasonable construction" of the language in the Project Pride agreement. *Barnard* v. *Barnard,* supra, 110.

It was the hearing officer's function to interpret the Project Pride agreement and conclude what it means.

Judicial review of his interpretation of the agreement is limited to a determination of whether it is supported by the evidence and correct under principles of contract construction. The trial court could properly conclude that there was substantial evidence in the record to support the hearing officer's determination that the school board had no obligation to establish a second Project Pride team and that the hearing officer had therefore appropriately fulfilled his responsibilities under the statute.

## II

The plaintiff next claims that the hearing officer and the trial court should have found that her discharge was illegal because there were open teaching positions filled by less senior tutors in the ESL program when she was discharged. Certain additional facts are necessary to the disposition of this claim. Following the first hearing before the hearing officer on August 31, 1990, Local 1464 had filed a grievance to the superintendent of schools alleging that: (1) a person was tutoring at Bristol Eastern High School two periods a day without certification and without being under contract as a teacher; and (2) a reduced time teacher was teaching two ESL courses.[12] On the basis of these allegations, Local 1464 had concluded, in the grievance, that the plaintiff should be appointed to the Bristol Eastern High School program. Local 1464 had also asked the state department of education to investigate its claim. After Local 1464 had filed the grievance, the school board eliminated both tutor positions, and transferred the tutoring functions to teachers, stating as its reasons for eliminating the positions that it had had trouble finding tutors willing to work for tutor pay rates and that it had been unable to find Spanish speaking tutors.

---

[12] Local 1464 filed the grievance pursuant to Article 6:3.2 of the original agreement between Local 1464 and the school board.

At the second hearing before the hearing officer on October 19, 1990, the plaintiff argued that although the ESL programs were staffed by tutors, they were in fact performing the work of teachers, as defined by state department of education regulations. In support of her argument, the plaintiff cited the state department of education decision, *In the Matter of Milford Education Assn.*, Case No. UC-86-1, September 2, 1987, which established criteria for determining whether a tutor is performing teaching functions.[13] The hearing officer ruled inadmissible the plaintiff's evidence on the issue of whether tutors were in fact performing the work of teachers.[14] During the course of the plaintiff's argument,

[13] *In the Matter of Milford Education Assn.*, Case No. UC-86-1, September 2, 1987, addressed the bargaining status of tutors in the Milford public schools. In that case, a question existed as to whether "tutors" employed by the Milford board of education were included in the "teachers' unit" within the meaning of General Statutes § 10-153b (a), governing the selection of teachers' representatives. Accordingly, pursuant to General Statutes § 10-153c (b), the Milford Education Association filed a unit clarification petition with the commissioner of education to clarify whether persons employed by the Milford board of education as tutors fell within the "teachers' unit" under § 10-153b (a).

The central analysis contained in *In the Matter of Milford Education Assn.* determined that "tutors" are deemed to be teachers within the meaning of § 10-153b (a) if "(1) [t]hey are not directly supervised in the delivery of instructional services by a certified professional employee in a position requiring certification; (2) [t]hey are responsible for the planning of the instructional program for the student; (3) [t]hey evaluate student progress; or (4) [t]hey do not receive specific directions from their supervising teacher or administrator that constitute a lesson plan for each lesson."

[14] The hearing officer permitted the plaintiff to make an offer of proof on this issue in which the plaintiff offered the testimony of the president of Local 1464 stating that tutors were doing the same types of jobs that the plaintiff had testified to doing as an ESL teacher. Additionally, the plaintiff offered a memorandum from the state department of education which defines, under *In the Matter of Milford Education Assn.*, Case No. UC-86-1, September 2, 1987, when a tutor is a teacher. Finally, the plaintiff proposed to argue that, as a matter of law, the ESL tutor positions were teaching positions, and, therefore, the plaintiff could not be discharged while available teaching positions existed.

the hearing officer asked the plaintiff if she had any interest in taking a tutor job at tutor pay, an offer she rejected.

The plaintiff argues that, pursuant to § 10-151 (d) (5), the school board was obligated to consider transferring the plaintiff to an ESL tutor position before terminating her position. The plaintiff reasons that she could not be discharged under § 10-151 (d) (5) if another teaching position existed to which she could have been appointed if qualified. According to the plaintiff, because the tutor positions were in fact teacher positions, other positions were available to which she could have been appointed. The plaintiff further asserts that the hearing officer failed to discharge his responsibilities as hearing officer because, by excluding evidence on the issue of whether ESL tutors were in fact teachers, he failed to undertake an adequate inquiry into the issue. The plaintiff finally argues that, had the hearing officer conducted such an inquiry and determined that at least one ESL tutor was in fact a teacher, he then would have had to have found that the school board failed to meet its obligation under § 10-151 (d) (5). According to the plaintiff, the trial court should have found that the hearing officer's failure to conduct such an inquiry entitles her to a new hearing. We reject the plaintiff's arguments.

First, the hearing officer correctly concluded that the plaintiff's claim was not properly before him. He based his conclusion on the following findings. The plaintiff conceded that the school board had designated the ESL positions as tutor positions, not teaching positions. Consistent with this designation, the hearing officer found that the board employed tutors at lower pay than teachers and that the board did not consider tutors to be part of the teachers' bargaining unit. Moreover, the hearing officer found that, because the plaintiff disclaimed any interest in a tutor's position at the lower tutor pay,

the plaintiff was not seeking placement in an ESL tutor position as a tutor. To the contrary, she was asking the hearing officer to determine if ESL tutor positions were in fact teaching positions and, if he so determined, to order the board to change the ESL tutor positions to teaching positions with concomitant pay and benefits.

The hearing officer correctly concluded that both of the plaintiff's requests would require him to exceed the scope of his power as an impartial hearing panel under § 10-151 (d). In his capacity as an impartial hearing officer, his role was to make factual findings, from which he was to determine whether adequate grounds existed for the plaintiff's discharge. From this determination, he was to make a recommendation to the school board as to whether contract termination was appropriate. In this case, the school board relied on § 10-151 (d) (5)— "elimination of the position to which the teacher was appointed"—as its basis for discharging the plaintiff. Thus, the hearing officer's primary role was to determine whether there were other positions existing for which the plaintiff was qualified and to which she could be appointed.[15]

The hearing officer met his responsibilities when he found that there were no other teaching positions available to which the plaintiff could be appointed. The only positions available were ESL tutor positions, at tutor pay, in which the plaintiff disclaimed any interest. Thus, the hearing officer properly concluded that no positions existed to which the plaintiff could be appointed.

Further, the hearing officer properly concluded that he lacked the authority under § 10-151 (d) to transform tutor positions into teaching positions so as to create additional opportunities for the plaintiff's continued employment. He ruled that the decision as to whether

[15] Indeed, the plaintiff conceded this at the October 19, 1990 hearing before the hearing officer.

a position is or is not within the bargaining unit properly rested with the state department of education, which has held hearings on this issue and has issued rules, as set forth in *In the Matter of Milford Education Assn.* General Statutes § 10-153c (b) provides that "[a] local or regional board of education or the exclusive representative of a teachers' or administrators' unit may file a unit clarification petition with the commissioner of education in order to clarify questions concerning the appropriate composition of an existing unit . . . ." Thus, the hearing officer properly concluded that the plaintiff cannot seek clarification of the status of the tutor positions through her statutory termination hearing.

Finally, because the hearing officer concluded that he lacked the authority under § 10-151 (d) to determine if ESL tutors were in fact teachers, he properly excluded the plaintiff's evidence on this issue. Evidence is admissible only if it is relevant. Accordingly, the hearing officer can legally exclude any evidence that is irrelevant. He excluded the plaintiff's evidence on the issue of tutors because it was irrelevant in light of his conclusion that he lacked the authority under § 10-151 (d) to determine whether ESL tutors were in fact teachers. The trial court would have had no basis for ruling otherwise.

## III

The plaintiff first raised her next claim on appeal to the trial court from the school board's decision, pursuant to § 10-151 (f). In this claim, the plaintiff asserts that her discharge was illegal because it contravened an important public policy.[16] According to the plain-

---

[16] Although the plaintiff's claims underwent metamorphosis throughout the hearings before the hearing officer, our examination of the record reveals that she first articulated this "public policy" claim on appeal to the trial court, only *after* the hearing officer had issued his findings and conclusions.

tiff, the school board, by refusing to assign a bona fide teacher, such as herself, to the ESL programs, "forced less-competent and less-credentialed teachers on ESL students." This decision by the school board, the plaintiff argues, contravened the public policy, expressed in both state and federal law, that mandates that students who are not yet proficient in English receive as good an education as students born into an English-speaking family.[17] The plaintiff further asserts that the school board closed down the ESL program, at Bristol Eastern High School, after Local 1464 filed her grievance, in order to defeat her challenge to her discharge. This action, according to the plaintiff, also violated applicable public policy.

In support of her arguments, the plaintiff cites *Sheets* v. *Teddy's Frosted Foods, Inc.*, 179 Conn. 471, 427 A.2d 385 (1980), with no accompanying analysis. In *Sheets*, this court first recognized the doctrine of wrongful discharge, which provides a common law cause of action in tort for wrongful discharge "if the former employee can prove a demonstrably *improper* reason for dismissal, a reason whose impropriety is derived from some important violation of public policy." (Emphasis in original.) Id., 475. Consequently, the plaintiff seemingly is attempting to inject into her statutory appeal a separate cause of action in tort. To make out a cause of action under *Sheets*, a discharged employee must

---

[17] In support of this policy, the plaintiff cites *Lau* v. *Nichols*, 414 U.S. 563, 94 S. Ct. 786, 39 L. Ed. 2d 1 (1974), which, according to the plaintiff, held it to be illegal under federal education guidelines and § 601 of the Civil Rights Act of 1964 to conduct education programs which have the effect of providing educational benefits to English-deficient students in a manner different from those given to students whose first language is English. The plaintiff also cites General Statutes § 10-4 et seq. and § 10-17 et seq. and §§ 10-145d-165 and 10-145d-166 of the Regulations of Connecticut State Agencies as prohibiting the assignment of less competent and less credentialed teachers to ESL programs by requiring that ESL teachers be certified as other teachers.

articulate an improper reason for her dismissal. The plaintiff's appeal, however, is not from an action in tort, but from an administrative decision. A tenured teacher's challenge of an allegedly wrongful discharge is governed by and limited to the statutory appeal process provided by § 10-151 (f).[18] *LaCroix* v. *Board of Education,* 199 Conn. 70, 78, 505 A.2d 1233 (1986); *Cahill* v. *Board of Education,* 187 Conn. 94, 102–103, 444 A.2d 907 (1982). Thus, the plaintiff cannot pursue a separate tort claim for wrongful discharge. Instead, she is limited by the available administrative remedies under § 10-151—of which she has availed herself and from which she has brought this appeal.[19]

To the extent that the plaintiff is attempting to claim, within the confines of her administrative remedies under § 10-151, that her discharge was based on an improper reason in contravention of public policy, her claim fails because she cannot properly raise it in the

---

[18] Even if the plaintiff could properly bring a separate tort claim for wrongful discharge, her claim fails for another reason. As an exception to the general rule that contracts of employment are terminable at will, "the right to recover in tort for wrongful discharge extends only to employees at will." *D'Ulisse-Cupo* v. *Board of Directors of Notre Dame High School,* 202 Conn. 206, 211 n.1, 520 A.2d 217 (1987). Because the plaintiff is a tenured teacher employed by the state, she is not an employee at will. In contrast, her employment contract is governed by General Statutes § 10-151 and a collective bargaining contract with the school board, setting forth the reasons for which she may be discharged. Thus, this plaintiff is not entitled to invoke the common law doctrine of wrongful discharge as a separate cause of action in tort.

[19] We have, however, permitted a plaintiff to bring a collateral judicial action where the plaintiff did not deliberately bypass the statutory appeal route and the defendant school board failed to provide a timely hearing. *LaCroix* v. *Board of Education,* 199 Conn. 70, 81, 505 A.2d 1233 (1986). Under such circumstances, we held that the school board's "total default" relieved the plaintiff of the obligation to pursue further administrative steps, and permitted the plaintiff to invoke judicial remedies to vindicate his constitutional rights to due process. Id. In this case, however, the school board has not acted in any way to relieve the plaintiff of her obligation to pursue her statutory remedies under General Statutes § 10-151.

first instance on appeal. Under § 10-151 (d) the responsibility for making factual findings is vested in the impartial hearing officer. In this case, he has not made any factual findings concerning the school board's decision to close down the ESL programs because the plaintiff never raised the claim before him. It was only on appeal to the trial court that the plaintiff first articulated her contention that the ESL positions were eliminated for the sole reason of defeating her discharge challenge.[20]

When the plaintiff first raised the claim on appeal, she based it on facts that were absent from the hearing officer's record and, in effect, asked the trial court, and now this court, to make findings of fact. On appeal from a school board decision, however, it is neither within the trial court's nor this court's province to make such factual findings. To the contrary, the scope of judicial review of an administrative appeal is very restricted; neither the trial court nor this court may retry the case or substitute its judgment for that of the hearing officer on questions of fact. *Rado* v. *Board of Education,* supra, 555.

In its memorandum of decision, the trial court did not explicitly address the plaintiff's public policy claim. The trial court, however, implicitly rejected the claim by affirming the school board's decision and dismissing all of the plaintiff's claims. Had the claim been made before the hearing officer, and had he failed to make findings pertaining to the claim, the trial court could, at most, have found that he should have ruled upon the claim, and, that being the case, would have sustained the appeal on that ground. *Levitt* v. *Public Utilities*

---

[20] Although the plaintiff did not raise the claim before the hearing officer, the claim was, nonetheless, available for her to make at the second hearing. The school board eliminated the ESL programs after Local 1464 filed its grievance, before the second hearing, and before the hearing officer had issued his findings and conclusions.

*Commission,* 114 Conn. 628, 634, 159 A.2d 878 (1932). The trial court, however, could not have found that the hearing officer was under an obligation to find facts and to rule on a claim that had not been raised. We conclude therefore, that, by failing to raise her claim before the hearing officer, the plaintiff in effect waived it.

## IV

The plaintiff claims finally that the hearing officer and the trial court should have found that the president of Local 1464 did not have apparent authority to execute the Project Pride and Alternative Education agreements. The plaintiff contends that such apparent authority was dissolved when the plaintiff made known to the school board that she was contesting the president's actual authority to bind Local 1464 to the agreements. The following additional facts are pertinent to disposition of this claim. At the August 31, 1990 hearing before the hearing officer, the plaintiff challenged the president's actual authority to enter into the Project Pride and Alternative Education agreements. Additionally, on September 12, 1990, the plaintiff sent individual letters to school board members informing them that the president lacked actual authority to sign the Project Pride and Alternative Education agreements. Finally, it was stipulated that, prior to January 14, 1991, the day of the plaintiff's discharge, each board member had knowledge of the plaintiff's contention that the president lacked actual authority.[21]

Negotiation of the Project Pride and Alternative Education agreements took place over the course of several meetings, between September, 1989, and March, 1990. Teams for the school board and for Local

---

[21] The plaintiff argued that the president of Local 1464 lacked actual authority because, in violation of the union constitution, the union membership never authorized the Project Pride and Alternative Education agreements, and neither the executive board nor the membership ever ratified them.

1464 negotiated the Project Pride and Alternative Education agreements protecting teachers in Project Pride and Alternative Education from the normal rules governing layoffs. The superintendent of schools, the assistant superintendent of schools, the director of personnel, and the principals of the two Bristol high schools comprised the school board's negotiation team. The president, secretary, treasurer, vice president, and two steward and executive council members of Local 1464 comprised its negotiation team. The school board chairman and the president of Local 1464 signed the two agreements on April 20, 1990. It was customary for such agreements to be signed by the president on behalf of the union and by the chairman on behalf of the school board. The question of actual authority was not raised during the negotiation or signing of the two agreements.

The plaintiff concedes that the president of Local 1464 had apparent authority when he signed and executed the agreements. The plaintiff, however, asserts that she terminated this apparent authority once she informed the school board at the hearing and through her letters to individual board members that she was contesting the president's actual authority to bind Local 1464.[22] According to the plaintiff, because her challenge to the president's actual authority came *before* the seniority provisions in the agreements went into effect and *before* the plaintiff was discharged, her challenge sufficiently revoked any apparent authority the president had when he signed the agreements. Consequently, the plaintiff argues, her challenge to the president's actual authority retroactively nullified the agreements. Finally, the plaintiff argues that the

---

[22] The plaintiff also asserts that the school board was apprised of the lack of actual authority of the president of Local 1464 through the availability of transcripts and briefs relating to the hearing officer's hearings and through articles and letters appearing in the press.

refusal by the hearing officer to admit her relevant evidence on the issue of actual authority resulted in his failure properly to consider whether apparent authority continued beyond August 31, 1990, the date she first contested the president's actual authority. According to the plaintiff, this failure to examine whether apparent authority was "terminated" required the trial court to set aside her contract termination. We disagree.

The authority of union negotiators depends upon the common law of agency. See *Kozera* v. *Westchester-Fairfield Electrical Contractors,* 909 F.2d 48, 54 (2d Cir. 1990), cert. denied, 498 U.S. 1084, 111 S. Ct. 956, 112 L. Ed. 2d 1044 (1991). Consequently, a union may be bound by the actions of its agent if third parties dealing with the agent reasonably believe the agent's actions are authorized. *National Labor Relations Board* v. *Local 815, International Brotherhood of Teamsters,* 290 F.2d 99, 103 (2d Cir. 1961). "Apparent authority is that semblance of authority which a principal, through his own acts or inadvertences, causes or allows third persons to believe his agent possesses." *Lewis* v. *Michigan Millers Mutual Ins. Co.,* 154 Conn. 660, 665, 228 A.2d 803 (1967), citing *Quint* v. *O'Connell,* 89 Conn. 353, 357, 94 A. 228 (1915). Consequently, apparent authority is to be determined, not by the agent's own acts, but by the acts of the agent's principal. *Nowak* v. *Capitol Motors, Inc.,* 158 Conn. 65, 69, 255 A.2d 845 (1969). The issue of apparent authority is one of fact to be determined based on two criteria. *Hollywyle Assn., Inc.* v. *Hollister,* 164 Conn. 389, 396, 324 A.2d 247 (1973); *Quint* v. *O'Connell,* supra. First, it must appear from the principal's conduct that "the principal held the agent out as possessing sufficient authority to embrace the act in question, or knowingly permitted [the agent] to act as having such authority." *Nowak* v. *Capitol Motors, Inc.,* supra; *Quint* v. *O'Connell,* supra. Second, the party dealing with the

agent must have, "acting in good faith, reasonably believed, under all the circumstances, that the agent had the necessary authority" to bind the principal to the agent's action. *Nowak* v. *Capitol Motors, Inc.,* supra; *Quint* v. *O'Connell,* supra.

Apparent authority terminates when the third person has notice that: (1) the agent's authority has terminated; (2) the principal no longer consents that the agent shall deal with the third person; or (3) the agent is acting under a basic error as to the facts. 1 Restatement (Second), Agency § 125, comment (a) (1958). "Unless otherwise agreed, there is a notification by the principal to the third person of revocation of an agent's [apparent] authority or other fact indicating its termination: (a) when the principal states such fact to the third person; or (b) when a reasonable time has elapsed after a writing stating such fact has been delivered by the principal (i) to the other personally . . . ." 1 Restatement (Second), Agency § 136 (1) (1958). In addition, "the principal can properly give notification of the termination of the agent's authority by . . . (b) giving publicity by some . . . method reasonably adapted to give the information to such third person." 1 Restatement (Second), Agency § 136 (3) (1958).

Application of these general principles to the facts of the case reveals that the factual finding by the hearing officer that the president of Local 1464 had apparent authority to negotiate valid Project Pride and Alternative Education agreements is supported by the evidence and is legally correct. The hearing officer found that, at the time the school board and Local 1464 negotiated the Project Pride and Alternative Education agreements, the school board, acting in good faith, reasonably believed that the president had apparent authority to negotiate, to agree, and to sign the agreements. Following this finding of apparent authority, the hearing officer concluded that the agreements were

binding and that the plaintiff's evidence showing lack of actual authority was inadmissible. These conclusions were both correct. Under agency principles, so long as the president had apparent authority at the time the agreements were executed, the agreements were valid. *National Labor Relations Board* v. *Local 815, International Brotherhood of Teamsters,* supra, 103. The hearing officer found, and the plaintiff conceded, that apparent authority existed when the agreements were signed and executed. Thus, he correctly determined that the agreements were valid. Moreover, the president's apparent authority, even absent actual authority, was enough to bind the parties to the agreements. Id. Accordingly, any evidence on the issue of actual authority was irrelevant to the validity of the agreements.

The hearing officer also properly declined to examine the issue of whether apparent authority continued beyond the signing of the agreements. Such an examination was unnecessary in light of his finding that the agreements were valid when executed. The plaintiff argues that she terminated apparent authority once she notified the school board that the president lacked actual authority. Admittedly, under agency principles, the plaintiff used methods of notification that would generally suffice to terminate apparent authority. To terminate apparent authority, however, notice of termination must come from the principal, in this case, the Local 1464 collective membership, rather than the plaintiff or any other individual member. Therefore, the plaintiff's notification to the school board could not validly terminate the president's apparent authority.

Moreover, the plaintiff's discharge did not occur until after the agreements were signed and executed. Nowhere does the law provide that a termination of apparent authority can retroactively nullify an agreement that was valid at the time it was made. There-

fore, whether the plaintiff actually terminated the president's apparent authority after the agreements were executed is inapposite to the agreements' continuing validity. The trial court, could not, as a matter of law, have concluded to the contrary.

The judgment is affirmed.

In this opinion the other justices concurred.