[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION FOR THE APPOINTMENT OF A RECEIVER AND TO WIND UP THE AFFAIRS OF THE DEFENDANT CORPORATION
The plaintiff, Shawmut Bank Connecticut, N.A., formerly known as the Connecticut National Bank, has filed a petition to wind up the business and affairs of the defendant, Connecticut Limousine Service, Inc., pursuant to General Statutes 33-382(a)(1) which provides, in part, as follows:
"(a) The superior court for the judicial district where CT Page 4152 the principal office of a corporation is located, or any judge thereof, shall windup the business and affairs of such corporation on petition of the following persons in the following cases: (1) In a proceeding by a holder or holders of shares having voting power sufficient under the circumstances to dissolve the corporation pursuant to the certificate of corporation."
The plaintiff claims to be entitled to the exclusive right to vote all 1,000 shares of the authorized, issued and outstanding stock of the defendant pursuant to a Pledge Agreement executed in September of 1986. The Pledge Agreement was amended as of August 28, 1992, as part of a larger transaction between the plaintiff and the defendant and other parties affiliated with the defendant, which is evidenced by a Loan Agreement bearing that date.
Pursuant to the Loan Agreement, the plaintiff was entitled to receive monthly principal interest payments in the amount of $105,150 which have not been paid since September of 1993. Plaintiff is presently owed under the Loan Agreement in excess of $8,000,000 in principal, interest and late charges. In November of 1993, the plaintiff declared the loans to be in default and thereafter sought to enforce, by the present proceeding, its claimed rights under the Pledge Agreement to exercise all voting rights pertaining to the pledged stock.
The defendant asserts that the plaintiff is not entitled to the relief sought on the grounds that: (1) the nonpayment of the loans do not constitute an event of default under the Pledge Agreement which is a condition-precedent to the right of the plaintiff to exercise exclusive voting rights; (2) defendant issued 10,000 shares of stock shortly before the scheduled evidentiary hearing and, therefore, the plaintiff does not have the right to vote the required shares to achieve the purposes sought; (3) the consent of the Union Trust Company ("Union Trust") was necessary in order to the institute the present action pursuant to a Participation Agreement between the plaintiff and the Union Trust Company and such consent was never obtained; (4) the notice declaring a default was forwarded to an improper address; and (5) the Pledge Agreement lists remedies which do not include the statutory remedy here asserted by the plaintiff.
The right of the plaintiff to obtain the relief sought is based upon the provisions contained in section 1C of the Pledge Agreement which provides as follows: CT Page 4153
 "C. If any Default shall have occurred and while the same is continuing:
 (1) The Bank or its nominee or nominees shall have the sole and exclusive right to exercise all voting and consensual powers pertaining to the Pledged Stock or any part thereof;"
Under section 1B(1) of the Pledge Agreement, the pledgor, i.e., the defendant, is entitled to exercise all voting and/or consensual powers pertaining to the pledge stock "[U]nless and until an Event of Default specified in section 4 hereof (any event so continuing being hereinafter called a `Default') shall occur:" (emphasis supplied). Defendant points out that section 4 of the Pledge Agreement only provides that "Connecticut Limousine Service, Inc. agrees with the Bank that it will not: (a) issue shares or classes of its stock or debentures of any kind other than those presently outstanding; or (b) redeem any shares of stock." The defendant therefore asserts that under section 1B of the Pledge Agreement the only basis for a plaintiff to exercise voting and consensual powers pertaining to the pledged stock is a violation of section 4 of the agreement which relates only to the issuance or redemption of stock.
The plaintiff, on the other hand, asserts that the reference to section "4" in section 1B is obviously a clerical or scribner's error and should have been a reference to section "5", which provides as follows:
 "SECTION 5. DEFAULTS. The following will constitute `Events of Default' hereunder, namely:
 A. Any representation or warranty made by the Pledgor in Section 7 hereof proves to have been incorrect or is breached in any material respect, and such default continues for five (5) days after the Bank has given written notice thereof to Pledgor; or
 B. Default by Pledgor for five (5) days in the performance of any term or condition hereunder or the performance of any term or condition under the Agreement; or
C. Default by Pledgor for five (5) days in the payment CT Page 4154 of any amount owing under the Agreement or the loan, when due."
Contracts must be construed not only as a whole but with a recognition of the fact that where apparently inconsistent provisions may be reconciled by a reasonable construction, that construction must be given because it is not assumed that parties intended to insert inconsistent or repugnant provisions. Dainty Rubbish Service, Inc. v. Beacon Hill Association, Assn., Inc.,32 Conn. App. 530, 534 (1993) and cases therein cited.
It is, of course, true that parties might enter a Pledge Agreement in which the only default would involve attempt to issue or redeem stock in contravention of a specific provision. Accordingly, if the court were only concerned with a claim that the phrase "section 5" should be inserted for the phrase "section 4" the court might be presented with a situation in which consideration should be given to viewing the action to be essentially one for reformation. However, section 4 of the Pledge Agreement is concerned with the issuance or redemption of stock and is not by its terms related to whether a violation of that section would or would not constitute a default. More importantly, however, the phrases "Event of Default" and "Events of Default" are only found in section 5 and in section 1B of the Pledge Agreement. Thus, a reference, in section 1B to "Event of Default" can only have reference to those provisions contained in section 5 relating to "Events of Default". The court must interpret the agreement so as to provide some meaning to the phrase "an Event of Default specified in Section". Mack Financial Corporation v. Crossley,209 Conn. 163, 168-169 (1988); A.M. Larson Co. v. Lawlor Ins. Agency, Inc., 153 Conn. 618, 621-622 (1966). Thus, the court is not faced with a claim that a provision which was specifically excluded from a contract should be placed in the contract by court action. See Greenwich Contracting Company v. Bonwit Construction Company, Inc.,156 Conn. 123 (1968).
Thus, the court concludes that the reference in Section 1B to "an Event of Default Specified in section 4" (which does not deal with Events of Default) rather than section "5" (which does deal with Events of Default) is simply a clerical or typographical error which is insufficient to defeat the plaintiff's claim. Price v. Age, Ltd., 194 Ga. App. 141, 390 S.E.2d 242 (1990); Kennedy v. Hospital Services Corporation, 118 Ill. App.3d 584,455 N.E.2d 206 (1984); see also, Prudential Property Casualty Insurance Company v. Raymond, 634 A.2d 1015 N.H. (1993); Brown v. Lange, CT Page 4155234 Kan. 610, 675 P.2d 842 (1984); Sciaba Construction Corporation v. Boston, 35 Mass. App. 181, 617 N.E.2d 1023 (1993).
The defendant also claims that the plaintiff does not possess sufficient voting power to dissolve the defendant as a result of transactions that took place purporting to increase the authorized, issued and outstanding shares of stock of the defendant from 1,000 shares to 11,000 shares. (See Exhibits 16 through 26). The parties have stipulated that, between September 1986 and the time of the transactions upon which the defendant's claims are based, the 1,000 shares referenced in the Pledge Agreement constituted the sole authorized, issued and outstanding shares of the corporation. In January and/or February of 1994, the defendant claims to have amended the certificate of incorporation so as to increase the authorized number of shares from 1,000 to 11,000 and to have issued an additional 10,000 shares of the defendant's stock to Connecticut Limousine Group, Inc. in return for a promissory note for $10,000. See Gen. Stat. 33-348(c).
When the defendant defaulted in payment of its obligations under the Loan Agreement, plaintiff was, pursuant to section 1C of the Pledge Agreement, entitled to the exclusive voting rights of the pledged stock which constituted the total authorized, issued and outstanding shares of stock of the defendant. Under General Statutes 33-360(b)(3), "The board of directors and shareholders may at any time, and from time to time, amend their certificate of incorporation. . .". "When a corporation is without shareholders or subscribers, authority to amend the corporation's certificate of incorporation resides with the board of directors. Where there are shareholders, affirmative action by both the board of directors and shareholders is required." Cross, Connecticut Corporation Law and Practice, section 7.2, p. 399 (Supp. 1991). Accordingly, as the plaintiff held the right to vote the shares of stock with respect to any amendment to the certificate of incorporation, the purported action taken by the defendant to amend the certificate of incorporation so as to increase the authorized shares of stock is invalid and does not constitute a defense to the claim asserted by the plaintiff.
The defendant also asserts that the plaintiff did not obtain the consent or permission of Union Trust to institute the present action and therefore is unable to assert the claims made. The defendant's argument is based upon a Participation Agreement between the plaintiff's predecessor and Union Trust dated September 19, 1986 which contains the following provision: CT Page 4156
 "Union and CNB agree that the Agent will not take any action or exercise any option given the Agent (i.e., CNB) under the Loan or under the security unless both banks are in agreement that such step should be taken and if such agreement is reached by Union and CNB it shall be binding upon both; provided, further, if no agreement is reached then the Agent may proceed in good faith upon its best judgment and shall be accountable to Union only for its gross negligence or wilful misconduct."
It appears from the testimony that the plaintiff was acting under the belief that the Union Trust had consented to the present course of action undertaken by the plaintiff when in fact no such consent existed. However, at the time of trial, Union Trust personnel unequivocally stated their agreement with the present course of action.
The defendant was not a signatory to the Participation Agreement or the affirmation of that agreement in 1989. The Agreement itself concerns the respective responsibilities between plaintiff and Union Trust. The Participation Agreement, however, does not obligate Union Trust to perform any acts or undertake any responsibilities to the defendant with respect thereto and the defendant is not entitled to any performance by Union Trust under the provisions of that agreement. The Participation Agreement did not obligate Union Trust to render any performance to the defendants and for that reason the defendants are not entitled to sue for its breach, if any there be. LHD Properties, Inc. v. Morgan Guaranty Trust Company of New York, 145 Ga. App. 132,243 S.E.2d 278, 280 (1978).
One who is not a party to a contract nor a contemplated beneficiary thereof cannot seek to enforce the promises contained in the contract. Tomlinson v. Board of Education, 226 Conn. 704,718 (1993). The test for determining the existence of a third party beneficiary is whether the contracting parties intended that the promisor should assume a direct obligation to the third party. Stowe v. Smith, 184 Conn. 194, 196 (1981). The Participation Agreement was executed to determine the respective responsibilities as between the plaintiff and Union Trust and the responsibility of the plaintiff as agent for such loan. A Participation Agreement relates to the rights as between the contracting parties and does not evidence any intent that either of the contracting parties should assume an obligation, direct or otherwise, to the defendant. CT Page 4157 Accordingly, the defendant is not a third party beneficiary and may not rely upon the terms of the Participation Agreement so as to defeat the claims advanced by the plaintiff.
The defendant claims that the plaintiff failed to give notice which was required on the grounds that the notice was forwarded to an address at 1032 Chapel Street in New Haven, Connecticut, and not to the address of the defendant at 230 Old Gate Lane, Milford, Connecticut.
Section 10 of the Pledge Agreement provides as follows:
 "NOTICES. Any notice herein provided to be given to Pledgor shall be delivered or mailed, first class postage prepaid, addressed to the Pledgor at the last address of Pledgor known to the bank or furnished to the bank in writing by the Pledgor."
The first amendment to the Pledge Agreement was executed in connection with the Loan Agreement dated August 28, 1992 and modified the original Pledge Agreement so as to provide for the defined term "agreement" to mean and refer to the Loan Agreement dated August 28, 1992. The Loan Agreement itself contains a provision, in 8.10 thereof, that all notices shall be mailed to the "borrowers" (which includes the Pledgor as defined in the Pledge Agreement), to: "c/o Joel Schiavone, Schiavone Corporation, 1032 Chapel Street, New Haven, Connecticut, 06510."
The parties have stipulated that the notice forwarded by the plaintiff was received at the New Haven address. Accordingly, the court finds that the notice, to the extent one was required, was in fact mailed and received at an appropriate address.
The defendant claims that the plaintiff does not have the right, under the Pledge Agreement, to seek the relief sought in the present action on the grounds that section 2 of the Pledge Agreement, entitled "Remedies", provides that the plaintiff shall have all rights under the commercial code: the right to apply any cash held by it as collateral to the payment of the notes; and, if there be no such cash, or the cash shall be insufficient to pay in full any obligations, then the bank may sell the pledged stock. Accordingly, the defendant claims that the remedies listed in the Pledge Agreement are exclusive and do not encompass the relief sought by the plaintiff. CT Page 4158
However, the Pledge Agreement does specifically provide, in section 1C(1), that upon a default "the bank or its nominee or nominees shall have the sole and exclusive right to exercise all voting and consensual powers pertaining to the pledged stock or any part thereof." If the remedies set forth in section 2 of the Pledge Agreement were intended to exclude all other remedies, it would be appropriate for the contract to have indicated the intent of the parties to afford exclusivity to the enumerated remedies. See Bender-Miller Company v. Tomwood Farms, Inc., 211 VA 585,179 S.E.2d 636, 639 (1971); Coastal Computer Corporation v. Team Management Systems, Inc., 624 So.2d 352, 353 (Fla.Dist.Ct.App. 1993); Graves v. The Estate of Grebe, 613 S.W.2d 148, 150 (Mo., Ct. App. 1981). In view of the fact that section 1C(1) of the Pledge Agreement provides that the plaintiff has the "sole and exclusive right to exercise all voting and consensual powers pertaining to the Pledged Stock", the court cannot conclude that the remedies as contained in section 2 of the agreement were intended to exclude all remedies that might emanate from the right to vote stock. Accordingly, the section on remedies in the Pledge Agreement does not provide a defense to the action of the plaintiff.
The plaintiff holds the right to vote all the authorized, issued and outstanding shares of stock of the defendant and is therefore entitled to relief sought pursuant to General Statutes 33-382(a)(1) which requires that the court "shall" wind up the business and affairs of the defendant. See Cross, Connecticut Corporation Law, 12.3, pp. 503-504. Accordingly, the court will hold a hearing on May 9, 1994 at 2 p.m. in Milford, Connecticut to determine the nature of any orders appropriate to accomplish the relief requested by the plaintiff.
Rush, J.