[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an action in one count seeking damages from the defendants (hereinafter sometimes collectively referred to as "Dimeo" or "Defendants")[1] for breach of a lease between the plaintiff lessor (hereinafter sometimes referred to as "Ellen Chorches") and the defendant Anthony J. Dimeo as lessee. Dimeo has filed special defenses, the first claims a constructive eviction and the second claims the lease is void. Additionally, Dimeo has asserted five counterclaims for damages for breach of agreement, unjust enrichment, constructive eviction, and "CUTPA violations.
Based on the facts and conclusions set forth below, on April 17, 1998, this court entered judgment in favor of the plaintiff on the complaint in the amount of $57,995.29 and for Dimeo on Count One of the counterclaims in the amount of $7,029.00. The court found in favor of the plaintiff on Counts Two, Three, Four and Five of the counterclaims.
This Memorandum of Decision sets forth the basis for that judgment. CT Page 6562
On December 31, 1996, the defendant, Anthony J. Dimeo entered into a commercial lease for premises at 130 Ella (Grasso Turnpike, Windsor Locks. ("The Lease"). At that time the property was owned by Seymour Chorches, who entered the Lease as Landlord. The Lease commenced on January 28, 1997, for a term of 15 months and for a base rent of $4,000.00 plus additional rent. It was personally signed and guaranteed by Anthony J. Dimeo. A provision of the lease restricted the tenant to the sale of used cars and repair of used cars owned by him. Seymour Chorches and Dimeo discussed Dimeo's intent to obtain a new car franchise. In "Additional Provisions of Lease" dated Dedcember 31, 1996, Seymour Chorches and Anthony Dimeo agreed that if Dimeo "obtains a new car franchise for this location then a new Lease will be required."
On January 1, 1997, prior to the commencement of the Lease, Anthony Dimeo took possession of the premises. The premises were in poor repair. Seymour Chorches submitted an insurance claim to cover the damage and agreed to reimburse Dimeo for monies he expended to make repairs to the premises. At the time of the repairs and agreement, Dimeo did not know that on January 6, 1997, Seymour had conveyed the premises and had assigned the Lease to Ellen Chorches, the plaintiff in this action.
Seymour and Ellen Chorches were married but had lived apart for many years. Ellen Chorches had no experience in renting and/or managing commercial real estate. On January 6, 1997, Seymour and Ellen Chorches agreed in writing that Seymour Chorches would act as her advisor and consultant to advise her as to "everything reasonably necessary for the proper management of the property." For his services Seymour Chorches was to receive a percentage of the rental income as well as a percentage of sale proceeds in the event the property was sold.
After transfer of the property to Ellen Chorches, Anthony Dimeo continued to deal with Seymour Chorches concerning the premises. Anthony Dimeo was not advised of the transfer of the premises from Seymour Chorches to Ellen Chorches until the end of March or the beginning of April. There is some evidence that Dimeo knew of the transfer before that time because Dimeo made rent checks payable to Ellen Chorches as early as February 27, 1997. I find it credible that Seymour Chorches told Dimeo to make the checks payable to his wife and that Dimeo did not know Ellen Chorches actually owned the property and was his Landlord or that Seymour no longer owned the premises and no longer was his CT Page 6563 Landlord. In April, 1997, at the direction of Seymour Chorches, a contractor removed a previously installed oil separator from the premises. The oil separator did not comply with regulations and was not on the "up and up. ". After the separator was removed, Dimeo continued to operate his business at the leased premises.
At the end of February, 1997, Dimeo received conditional approval to become a Subaru dealer "in Windsor Locks, Connecticut" The conditional approval required Dimeo to be ready to open a dealership on or before April 30, 1997. Thereafter, Dimeo attempted to negotiate a new lease or a purchase of the premises with Ellen Chorches. Dimeo's real desire was to purchase the property. The parties did not reach an agreement.
Dimeo paid rent to the plaintiff through July 31, 1997. He remained in the premises at 130 Ella Grasso Turnpike, Windsor, Connecticut until July 31, 1997. On August 6, 1997, Dimeo received a fully executed Subaru Dealership Agreement for a dealership known as Ty Subaru, LLC, at premises located at 391 Ella Grasso Highway, Windsor Locks, Connecticut. Ellen Chorches never accepted a surrender of the premises.
The plaintiff has sustained her burden to prove the allegations of the complaint. Further, for the following reasons, Dimeo cannot prevail on his Special Defenses.
In the First Special Defense, Dimeo claims constructive eviction. When he signed the lease, the premises were in good condition. After entering into possession, Dimeo discovered the roof leaked. It is alleged this was brought to the attention of Seymour Chorches who agreed to repair the roof and did so. Dimeo claims, however, the leaking roof caused substantial damage to the interior of the premises. It is also alleged that in April 1997, an oil separator necessary for the operation of Dimeo's used car business was removed from the premises at the direction of Seymour Chorches. As a result, Dimeo claims he could not conduct his business and was forced to vacate the premises.
 [A] constructive eviction arises where a landlord, while not actually depriving the tenant of possession of any part of the premises leased, has done or suffered some act by which the premises are rendered untenantable, and has thereby caused a failure of consideration for the tenant's promise to pay rent." (Internal quotation marks omitted.) Conference Center Ltd. v. TRC, 189 Conn. 212, CT Page 6564 220, 455 A.2d 857 (1983). In addition to proving that the premises are untenantable, a party pleading constructive eviction must prove that (1) the problem was caused by the landlord, (2) the tenant vacated the premises because of the problem, and (3) the tenant did not vacate until after giving the landlord reasonable time to correct the problem. Thomas v. Roper, 162 Conn. 343, 349, 294 A.2d 321 (1972).
 Baretta v. T T Structural, Inc., 42 Conn. App. 522, 526
(1996).
The defendants did not sustain the burden to prove the premises were untenantable. Dimeo remained in the premises through July 31, 1997, and conducted his business there. Ellen Chorches received rental payments and numerous calls from Dimeo regarding his desire to purchase or anew lease of the premises. There is no evidence Dimeo complained that he could not operate his business at the site. Defendants presented no evidence in the form of lost income or otherwise to support a claim that business was not and could not be conducted on the premises. In addition, the roof was repaired by Seymour Chorches and he also agreed to make other repairs or pay Dimeo for them. Dimeo did undertake to make repairs.
I further find Dimeo did not vacate the premises because of the interior problems or because of the removed oil separator; rather he vacated because he could not negotiate a new lease or purchase agreement for the premises. He found another location out of which to operate a new car franchise. This did not relieve him of the obligations under the Lease. Dimeo was proceeding on two fronts. Up until August 1997, when the franchise was secured for a different location, Dimeo remained in the leased premises and operated his business there. As soon as the franchise was secured for another location he vacated.
The Second Special Defense asserts a claim that the Lease is void. Dimeo contends the Lease, by its terms, terminated when he obtained a new car franchise from Subaru Motors in March 1997.
 A contract is to be construed as a whole and all relevant provisions will be considered together. . . . a contract must be construed to effectuate the intent of the contracting parties. If the parties have reduced their agreement to a writing, their intent is to be CT Page 6565 determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. The question is not what intent existed in the minds of the parties but what intention is expressed in the language used. Further, [a] promise not In interpreting contract items, . . . the intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. . . . Where the language is clear and unambiguous, the contract is to be given effect according to its terms. (Citations omitted, internal quotation marks omitted.)
Tomlinson v. Board of Education, 226 Conn. 704, 722 (1993).
Application of these principles to the Lease in this case does not support Dimeo's position. Paragraph 22 of the Lease refers to additional provisions attached to the Lease which state in pertinent part as follows:
 2. If Tenant obtains a new car franchise for this location then a new Lease will be required.
 7. This Lease may be cancelled (sic) by Tenant if Tenant cannot ge(t) a Used Car License by March 15, 1997.
The language of the Lease does not require the parties to agree upon a new lease, it simply states that "a new Lease will be required." Nor does the language provide the Lease will terminate when and if the Tenant obtains a new car franchise. Nor does it state the Lease may be canceled by the Tenant if the Tenant obtains a new car franchise. This is in contrast to Paragraph 7 of the additional lease provisions which expressly states, "Lease may be canceled by Tenant if Tenant cannot get a Used Car License by March 15, 1997."
The evidence indicates there were ongoing discussions about a purchase or new lease for the premises in the period before Dimeo vacated. The parties apparently could not reach a mutual agreement. The Lease does not require that they do so. Dimeo could have negotiated to include the language which he now seeks to import into the Lease when it was executed. That may be what CT Page 6566 Dimeo had intended, but that is not what the Lease provides or necessarily implies. "A promise not expressly made will not be read into the contract unless it arises by necessary implication from the provisions of the instrument." Tomlinson v. Board ofEducation, supra.
Judgment may enter for the plaintiff on her complaint. The court finds that the plaintiff sustained damages as a result of the defendants' breach of lease in the amount of $50,270,[2]
plus attorneys fees and costs in the amount of $15,725.29. Crediting the defendants' security deposit of $8,000, judgment may enter for the plaintiff against the defendants in the amount of $57,995.29.
The defendants have asserted counterclaims in five counts. In Count One, Dimeo seeks reimbursement of the expenditures he made for repair to damage to the interior of the premises caused by a leaking roof. It is claimed that Seymour Chorches agreed to make the repairs or to reimburse Dimeo. It is also claimed that Seymour Chorches was acting as the agent for Ellen Chorhces.
The evidence shows that on January 6, 1999, the date Seymour Chorches transferred the premises to Ellen Chorches, he and she entered into an agreement which refers to him as "Adviser and Consultant" and to her as Owner. Ellen Chorches had no experience in managing leased property. Seymour Chorches agreed to advise Ellen as to everything reasonably necessary for the proper management of the property. In exchange, Seymour was entitled to a percentage of the gross monthly profits and to a percentage of the net proceeds in the event of a sale of the property. Ellen Chorches did not inform Dimeo of the transfer of the property to her or of the assignment of the Lease to her. After the transfer, Seymour Chorches continued to deal with Dimeo and the property in the manner of a landlord. On April 7, 1999, Seymour Chorches signed an Agreement as "Seymour Chorches, Landlord" and agreed "to be responsible for the repair of the ceiling tiles, insulation and heating vents damaged by the defective roof." The Agreement further provides that if Dimeo makes the repairs, the landlord will reimburse him upon demand. Under these circumstances, Dimeo could, and did, reasonably believe that Chorches was authorized to enter the Agreement.
 Apparent authority is that semblance of authority which a principal through his own acts or inadvertances, causes or allows third persons to believe his agent CT Page 6567 possesses." Tomlinson v. Board of Education, 226 Conn. 704, 734, 629 A.2d 33 (1993). (Internal quotation marks and citation omitted.) Tomlinson explains that the issue of apparent authority is one of fact to be determined based on two criteria. First, it must appear from the principal's conduct that the principal held the agent out as possessing sufficient authority to embrace the act in question. Second, the party dealing with the agency must have reasonably believed, under all the circumstances that the agent had the necessary authority to bind the principal to the agent's actions. Id. at 734-35.(Emphasis added.)
Goldwater v. Ollie's Garage, No. 357372 (Feb. 18, 1998) (Blue, J.)
The credible evidence in this case establishes the existence of both of these criteria. First, whether through inadvertence or design, by entering into the consulting agreement with Seymour Chorches, Ellen Chorches left the management of the property to him. She never went to the property in February and March of 1997. She makes no claim that she managed the property when the repairs had to be made and when Seymour agreed to reimburse Dimeo for making the repairs. She had no experience in managing commercial property, did not manage the property and there is no evidence that she retained anyone other than Seymour to do so. She allowed Seymour, through inadvertence or design, to manage the property and hold himself out as having the authority to do so.
Second, Dimeo's acts, show that he reasonably believed Seymour Chorches had the authority to agree to reimburse his expenses for repairs to the premises. Ellen Chorches did nothing to indicate to Dimeo that she was now the owner of the property and that he must deal with her. There was no evidence that Ellen Chorches ever advised Dimeo that Seymour was neither the owner nor her agent. Seymour Chorches had authority to bind Ellen Chorches. Application of these general principles to the facts of the case sustains a finding that Seymour Chorches had apparent, if not actual, authority to agree to reimburse Dimeo for the repairs to the premises.
Dimeo presented evidence to substantiate the expenses incurred by him in making those repairs in the amount of $7,029.00 and have award damages in that amount. CT Page 6568
In Count Two, Dimeo asserts a claim of unjust enrichment grounded on his having provided Seymour Chorches with an itemization of the repairs made to the premises and their cost. He claims that Seymour Chorches submitted the information to his insurance carrier, received the insurance proceeds and retained them. In the first count, I have awarded Dimeo for the cost of repairs under the Agreement with Seymour Chorches. "Unjust enrichment is essentially an equitable doctrine, to be applied where no remedy is available pursuant to contract. See BarabaraWeisman, Trustee v. Kaspar, 233 Conn. 531, 330 (1995); AyotteBros. Construction Co. v. Finney, 42 Conn. App. 578, 580-81
(1996).
In Count Three of the Counterclaims, Dimeo, reasserts the claim of constructive eviction and seeks a return of the security deposit and all rent paid. For the very reasons set forth in deciding against Dimeo on the First Special Defense, I find Dimeo has not met the burden of proving constructive eviction.
In Count Four, Dimeo seeks return of the security deposit and all rent paid on the ground that the landlord will be unjustly enriched if allowed to retain those amounts. "Unjust enrichment is essentially an equitable doctrine, to be applied where no remedy is available pursuant to contract. See Barabara Weisman,Trustee v. Kaspar, supra; Ayotte Bros. Construction Co. v.Finney, supra. For the reasons set forth in rendering judgment for the plaintiff on the complaint, Dimeo cannot prevail on this claim. Under the terms of the Lease, Dimeo was required to pay rent for the premises. The security deposit was credited against the rent due and owing to the plaintiff in the award of damages under Lease. The defendants cannot prevail on Fourth Count.
Dimeo's fifth count alleges a CUTPA violation. General Statutes § 42-110b(a) prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Our Supreme Court has explained that:
 It is well settled that in determining whether [an act or] practice violates CUTPA we have adopted the criteria set out in the cigarette rule by the federal trade commission for determining whether [an act or] practice is unfair: (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been CT Page 6569 established by statutes, the common law, or otherwise — whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers. . . . All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three. . . . Thus a violation of CUTPA may be established by showing either an actual deceptive practice . . . or a practice amounting to a violation of public policy.
Saturn Construction Co. v. Premier Roofing Co., 238 Conn. 293,310-11 (1996).
The allegations of this count are directed to Seymour Chorches. He is not a party to this action. In Paragraph 10, it is alleged that "At all pertinent times, the landlord was engaged in the business of owning and letting commercial real estate. And in Paragraph 11, the specific conduct of the land, lord which is alleged to constitute unfair or deceptive acts or practices by reason of which Dimeo suffered an ascertainable loss are "(a) letting the subject premises to DiMeo with the knowledge that the roof leaked as it did; (b) entering the premises after the commencement of the lease term and disabling the oil separator and the flood drains and (c) agreeing to reimburse DiMeo for repairs which were the landlord's responsibility and then failing to make the agreed reimbursement."
As to (a), Ellen Chorches did not let the subject premises to Dimeo. She did not own the property when it was leased. Furthermore, when Dimeo signed the Lease, he acknowledged that the premises were in good condition.
As to (b), Dimeo presented no evidence of ascertainable loss from the dismantling of the oil separator. He continued in business as a retailer and repairer of used cars until he vacated to start a new car dealership at another location.
As to (c). Again, the agreement to reimburse was made with Seymour Chorches, and although I have found Ellen Chorches obligated by the terms of that agreement under the doctrine of CT Page 6570 apparent agency, I do not find that she, who is the party to this action, engaged in behavior which can be considered oppressive, unethical or unscrupulous, or that she should be found to have engaged in an unfair and deceptive practice — vicariously. Accordingly, I do not find in favor of the defendant on the Fifth Count of the Counterclaim.
Tanzer, J.