[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This matter was tried to the court on June 6, 2002. Thereafter, on June 28, 2002. the parties filed post-trial briefs. After considering the evidence and the arguments of the parties, the court issues this decision. The court finds the issues in favor of the defendants.
 I. PROCEDURAL BACKGROUND
The plaintiff, Robert Rosenswaike, filed a two count complaint, dated July 9, 1999. In the first count, the plaintiff alleges that the defendants, M W Construction, Inc. (M W) and Christopher J. Mather, executed a promissory note, payable to the plaintiff, in the principal amount of one hundred thousand dollars ($100,000.00), together with interest at the rate of twelve per cent per annum, with a final installment of the principal balance due on March 31, 1995. The plaintiff alleges that despite his demand of the defendants for payment, they have refused and neglected to do so. He alleges that he is the holder of the note and that the defendants owe him the principal amount, plus interest and attorney's fees as provided in the note.[1]
The defendants filed an answer and counterclaim to the complaint, dated October 22, 1999 (#104). Therein, they admit executing a promissory note payable to the plaintiff, in the principal amount of $100,000.00, but leave the plaintiff to his proof as to when it was due. They deny the first count's allegations of nonpayment of the principal balance. They deny owing money to the plaintiff. CT Page 9377
In their counterclaim, the defendants alleged that they borrowed $100,000.00 from the plaintiff, and made full and complete payment of the entire principal sum and all interest due thereon. In addition, they alleged that they had paid to the plaintiff $25,000.00 more than was due on their obligation. At trial, the defendants withdrew their counterclaim.
The witnesses who testified at trial included the plaintiff, defendant Christopher Mather, and Ann Mundinger, who is the plaintiffs former wife. In addition, the parties submitted documentary evidence.
 II. FACTS
The court finds the following facts and credits the following evidence, except as noted. The plaintiff had known Mather for about eight years, first as a friend, and then as a son-in-law, before suing him. The plaintiff met Mather through Mundinger, the plaintiffs now-former wife. The plaintiff and Mundinger were married for eighteen years. He met Mather after he and Mundinger had been married for nine or ten years. The plaintiff attended the wedding of Mather and Mundinger's daughter, Bonnie. As discussed below, Bonnie Mather died before this action was commenced. Mather saw the plaintiff at family gatherings for Thanksgiving and Christmas. He and the plaintiff also took a couple of fishing trips together.
In 1993 or 1994, the plaintiff and his wife began living apart. While they were still living together, Mundinger brought to him a request from Mather. Mather and his partner, George Watson had started M W, to engage in the business of bridge construction and rehabilitation, and sought funding from the plaintiff, which he eventually agreed to provide, by loan. The plaintiff identified a promissory note (Plaintiff's Exhibit 1), dated March 21, 1993, in the principal amount of $100,000.00. The original due date was April 1, 1994. He was given the checks for the payment of monthly interest of one thousand ($1,000.00) dollars and the principal in advance. The plaintiff acknowledged that the interest was paid.
The agreement was re-written for a second term. Plaintiff's Exhibit 2 is another promissory note, by which Mather and Wilson personally guaranteed the payment obligation of M W, again for the principal amount of $100,000.00. The maturity date of that obligation i March 31, 1995. Again, checks were given to him in advance, thirteen in all, twelve for the monthly interest payments of $1,000.00, and one for the principal balance (Plaintiff's Exhibit 3).
The plaintiff was engaged in the business of preparing advertising CT Page 9378 supplements for home delivery, and placing advertisements in newspapers. Mundinger is a certified public accountant, who, the plaintiff acknowledged. assisted the plaintiff, to "some degree," in the conduct of his business. Transcript ("Tr."), p. 14. Mather negotiated the $100,000.00 loan and its extension with the plaintiff through Mundinger. Mundinger prepared both notes, Plaintiff's Exhibits 1 and 2. Tr., p. 73. It was she who communicated to the plaintiff M W's request for an extension of the loan. During the course of the commercial relationship between the plaintiff and Mather/M W, the plaintiff received checks from Mather through Mundinger. According to the plaintiff, it was customary for her to accept the checks from Mather and give them to the plaintiff, either in hand or by mail. Tr., p. 45. Mather never gave checks directly to the plaintiff he gave them to Mundinger to give to the plaintiff. For the new note, Mundinger made out the checks in advance, which were signed by Mather. She then provided them to the plaintiff. When the plaintiffs bank changed names, new checks had to be prepared, listing a new payee. Again, Mather signed these checks and gave them to Mundinger to provide to the plaintiff. Tr., p. 70.
Although they were living apart, the plaintiff characterized his relationship with his wife during this period: "I was led to believe that we had a real good relationship. Although it was kind of shaky, I believed that we still had a good relationship and wanted to help." Tr., p. 28.
After the plaintiff loaned the funds to M W, Bonnie Mather became seriously ill. Tr., p. 71-72. Mundinger, her mother, moved to Connecticut, to help care for her daughter and to take over Bonnie's role in assisting Mather in running his business. The plaintiff acknowledged that her illness and eventual death was a catastrophic event for all family members, including himself.
Although he had received in advance M W's check, dated March 31, 1995, made payable to him, for the $100,000.00 principal amount, the plaintiff acknowledged that he never deposited it or presented it for payment. Transcript ("Tr."), pp. 9, 25; see Plaintiff's Exhibit 3, a check dated March 31, 1995 (hereinafter, "the March 31, 1995 check"). He vaguely stated that he "spoke with, I guess, a manager at the bank. He told me that the funds weren't there." Tr., p. 9. The bank was not identified.
Soon after Bonnie's death, which occurred on May 15, 1995, the plaintiff pursued the subject of payment with Mundinger. The plaintiff then "held on to the check because I was asked to hold on to it for a little while longer." Tr., p. 9. CT Page 9379
Mather was distraught after his wife's death. He was unable to focus on conducting his business. In June, 1995, Mather discussed with Mundinger paying off the note. Mundinger prepared Defendant's Exhibit A, an M W check, dated June 16, 1995, for $100,000.00, in which the plaintiff is listed as the payee (hereinafter "the June 16, 1995 check"). Mather signed this check. Tr., p. 76. As he had with other checks in the past, he gave it to Mundinger. He had no further discussion with her as to what she was going to do with it. Tr., p. 76.
Mundinger then telephoned the plaintiff and told him that she had another check from M W made payable to the plaintiff, for the full principal amount of the loan. See Defendant's Exhibit A.
The following testimony was elicited from the plaintiff on the subject of this check:
"Q All right, and she told you-did she tell you that she was going to deposit it?
A At that point, I don't recall her saying that, but she might have. I don't know. I think that she has said that she asked for the check because she said she had a check. I said how could . . . you have a check if I have the check. So I made out another check. I said well, that's not the check. I have the check. That's all I recall.
Q Well, do you recall, sir, getting angry with your wife when she told you she would deposit it?
A I told her she could do whatever she wants with the check. It has nothing to do with me. It's not my check. I have the check. Write all the checks you like." Tr., pp. 26-27. The plaintiff acknowledged that, thereafter, his then-wife forged his name on M W's check, endorsed it to herself, and deposited it. He agreed that the check was honored. Tr., p. 44. At trial, he referred to her behavior as "criminal." Tr., p. 45.
Although he had the opportunity then to deposit the March 31, 1995 check (Plaintiff's Exhibit 3) which was in his possession, and which was not yet overdue,[2] the plaintiff did not do so. There is no evidence to show that the plaintiff ever communicated with Mather about the debt, or that he made demand on Mather for payment. There is also no evidence that the plaintiff attempted to request Mather to stop payment on the June 16, 1995 check. Prior to the plaintiffs institution of this suit, Mather never discussed the plaintiffs claim with him. Tr., pp. 86-87. Instead, the record shows that the plaintiff acquiesced in the course of action that his wife told him in advance she planned to undertake. CT Page 9380
In August, 1995, the plaintiff directed his attorney to draw up a proposed separation agreement, which was sent to Mundinger. Tr., p. 31.[3]
M W ceased doing business, as a result of lack of work; its operations were wrapped up by about May, 1996.
During that year, Mather and Mundinger started a dry-cleaning business in Haddam, Connecticut. Mundinger contributed over $25,000.00 to the start-up of this enterprise. Tr., p. 82-83. Mather contributed about $10,000.00. Mather stated that it never occurred to him that the source of funds for Mundinger's investment came from M W's check. Tr., p. 86.
The plaintiff began divorce proceedings against Mundinger in the Florida courts in September, 1998. The plaintiff sought a prejudgment remedy against Mather by application filed in this court on July 12, 1999, more than four years after the plaintiff became aware of M W's June 16, 1995 check. The plaintiff and Mundinger were divorced in December, 1999. Plaintiff's Exhibit 5A, a portion of the settlement agreement, signed by the plaintiff,[4] and signed by Mundinger on December 1, 1999, reflects that the plaintiff released Mundinger from any claims he had against her in connection with the note or any proceeds therefrom. See Plaintiff's Exhibit 5A, paragraph 19.
The plaintiff claims that, although he is still the holder of the note, he has not received payment from Mather or M W of the $100,000.00 principal.[5] With interest, he is seeking $186,202.96.
In the facts set forth above, the court principally relies on the testimony of the parties. While Mundinger, a non-party, also testified, the court views the bulk of her testimony as being cumulative. Her testimony included the following, which was not disputed. She stated that she spoke with the plaintiff on June 16, 1995 and informed him that she had M W's check for the loan repayment (Defendant's Exhibit A) on that date. Tr., pp. 108-110. Thereafter, she did not deposit the check until three days later, June 19, 1995. Tr., pp. 109-111[6] She also testified that, in all of the discussions which were held in order to resolve financial issues related to the divorce, the plaintiff sought to make sure that the $100,000.00 she obtained as a result of signing his name on and depositing the June 16, 1995 check was allocated to her in the division of their marital assets. Tr., p. 115, lines 1-9.[7] The plaintiff did not challenge or rebut this testimony, although he was present to hear it and afforded the opportunity to present testimony in rebuttal.[8] As noted, the plaintiff and Mundinger reached agreement concerning the divorce in December, 1999, as a part of which Mundinger was released from any claims related to the note.
In an effort to impeach her credibility and to establish a conspiracy CT Page 9381 between Mundinger and Mather concerning the proceeds of the June 16, 1995 check, inconsistencies between Mundinger' s trial testimony and that in her deposition in the divorce proceedings were elicited from Mundinger on cross-examination. At trial, she denied investing a portion of the proceeds of the check in the cleaning business she went into with Mather and denied using a portion of it to loan money to her son for use in his business. Tr., pp. 123-125. Subsequently, she admitted that, in the divorce action, she had stated that she did invest proceeds from the check in the cleaning business and in her son's business. Tr., p. 127. In explanation, she stated that she had other money, from life insurance proceeds and in an investment account, available to use for the cleaning business. Tr., p. 128, 133-134.[9] No evidence was presented to show Mundinger's or Mather's financial condition at the times at issue, or at any time, such as by financial affidavit or bank statements. As discussed further below, the court is unpersuaded that Mundinger and Mather engaged in a conspiracy against the plaintiff. Other facts are referenced below by the court in the context of its discussion of the issues.
III. DISCUSSION
The plaintiff claims that Mundinger was not acting as his agent when she accepted M W's check; rather, he contends that Mundinger was Mather's agent, and conspired with him to misappropriate the money. Mather claims that, throughout the commercial relationship at issue, Mundinger functioned as the plaintiffs agent and that Mather, in good faith, presented the final payment to her as such in order to discharge the obligation to the plaintiff.
"Agency is defined as the fiduciary relationship which results from manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act. . . . Thus, the three elements required to show the existence of an agency relationship include: (1) a manifestation by the principal that the agent will act for him; (2) acceptance by the agent of the undertaking; and (3) an understanding between the parties that the principal will be in control of the undertaking." (Internal quotation marks omitted and citations omitted.) Gateway v. DiNoia, 232 Conn. 223,239-40, 654 A.2d 342 (1995).
"[U]nder the ordinary rules of contract, an agent who has apparent authority, but not express authority, can bind his principal, especially as to parties who act in good faith." Hall-Brooke Foundation, Inc. v.City of Norwalk, 58 Conn. App. 340, 344, 752 A.2d 523 (2000). "Apparent authority is that semblance of authority which a principal, through his own acts or inadvertences, causes or allows third persons to believe his agent possesses. . . . Consequently, apparent authority is to be CT Page 9382 determined, not by the agent's own acts, but by the acts of the agent's principal. . . . The issue of apparent authority is one of fact to be determined based on two criteria. . . . First, it must appear from the principal's conduct that the principal held the agent out as possessing sufficient authority to embrace the act in question, or knowingly permitted [the agent] to act as having such authority. . . . Second, the party dealing with the agent must have, acting in good faith, reasonably believed, under all the circumstances, that the agent had the necessary authority to bind the principal to the agent's action." (Internal quotation marks omitted and citations omitted.) Tomlinson v. Board ofEducation, 226 Conn. 704, 734-5, 629 A.2d 333 (1993).
"The testimony of the principal, however, is not necessary to prove agency. The existence and extent of an agency relationship may be established by circumstantial evidence based upon an examination of the situation of the parties, their acts and other relevant information."Gateway v. DiNoia, supra, 232 Conn. 240. "Apparent authority may be derived from a course of dealing." Edart Truck Rental Corp. v. B. Swirsky Co., 23 Conn. App. 137, 140, 579 A.2d 133 (1990).
"Apparent authority terminates when the third person has notice that: (1) the agent's authority has terminated; (2) the principal no longer consents that the agent shall deal with the third person; or (3) the agent is acting under a basic error as to the facts. 1 Restatement (Second), Agency, 125, comment (a) (1958). `Unless otherwise agreed, there is a notification by the principal to the third person of revocation of an agent's [apparent] authority or other fact indicating its termination: (a) when the principal states such fact to the third person; or (b) when a reasonable time has elapsed after a writing stating such fact has been delivered by the principal (i) to the other personally. . . .'1 Restatement (Second), Agency 136(1) (1958). In addition, `the principal can properly give notification of the termination of the agent's authority by . . . (b) giving publicity by some . . . method reasonably adapted to give the information to such third person.' 1 Restatement (Second). Agency 136(3) (1958)." Tomlinsonv. Board of Education, 226 Conn. 704, 735, 629 A.2d 333 (1993).
"The issue of apparent authority is one of fact, requiring the trier of fact to evaluate the conduct of the parties in light of all the surrounding circumstances." (Internal quotation marks omitted.) EdartTruck Rental Corp. v. B. Swirsky Co., supra, 23 Conn. App. 140. "The nature and extent of an agent's authority is a question of fact for the trier." (Internal quotation marks omitted.) Newtown Associates v.Northeast Structures, Inc., 15 Conn. App. 633, 638, 546 A.2d 310 (1988).
"`To discharge an obligation, payment must be made to the obligee CT Page 9383 himself or to some third person authorized to receive it.' 60 Am.Jur.2d Payment 87 (1987). `One making payment to an agent has the burden of showing that the latter had express or apparent authority to receive such payment.' Taylor v. Merrill, Lynch, Pierce, Fenner Smith, Inc.,245 A.2d 426, 427 (D.C. 1968)." Century Mortgage Co. v. George, Superior Court, judicial district of Waterbury, Docket No. 95538 (Jan.12, 1993,Blue, J.), affirmed, 35 Conn. App. 326, 646 A.2d 226, cert. denied,231 Conn. 915, 648 A.2d 150 (1994).
Mundinger acted as the plaintiffs agent from the beginning of the plaintiffs business relationship with M W and Mather, while the plaintiff remained in control. The evidence before the court shows that, from the inception of the loan relationship at issue, the plaintiff dealt with Mather solely through using Mundinger' s services as the plaintiffs agent. The plaintiff did not deal directly with Mather; instead, he had Mundinger do so. All communications from the plaintiff about the transactions, including the extension of the original term, went through Mundinger. Mundinger prepared the notes, and later prepared checks for the interest payments. After checks were signed by Mather, she presented them to the plaintiff. The use of Mundinger as the plaintiffs agent continued throughout the time when the plaintiff and Mundinger were living separately; they were not divorced until long after the final payment was made by M W in June, 1995.
Thus, the plaintiff held Mundinger out to Mather and M W as his agent and as possessing sufficient authority to embrace the act of accepting a check on his behalf. After all, Mundinger had accepted checks in the past, in connection with the first and second notes.[10] Under these circumstances, Mather, acting in good faith, reasonably believed that Mundinger had the necessary authority to accept, on the plaintiffs behalf, the June 16, 1995 check as final payment. The credible evidence before the court, including that of Mather himself, shows that he made the payment of the $100,000.00 to the plaintiffs agent in good faith. Under the circumstances, Mundinger had such apparent authority. As the plaintiff acknowledged, M W's check was honored when deposited.
Further, the record reflects that, at no time prior to the presentation of the June 16, 1995 check did the plaintiff take any step to communicate to Mather that Mundinger, who was then still married to the plaintiff, was no longer his agent. Mather had no notice that Mundinger's apparent authority had been terminated by the plaintiff when he presented the check to Mundinger as payment to discharge his and M W's obligation to the plaintiff.
The court is unpersuaded that Mather engaged in a conspiracy with Mundinger. The fact that Mundinger subsequently invested money in a CT Page 9384 venture with Mather, her former son-in-law, does not prove that Mather acted in bad faith or conspired to deprive the plaintiff of the money which was owed to him.
The court is also unpersuaded by the plaintiffs argument that the drawing of the June 16, 1995 check, at the time the plaintiff was in possession of the March 31, 1995 check is evidence of a conspiracy. At trial, Mather could not explain why the later check was drawn. In view of the fact that, leading up to the time in question, his wife had gone through a period of serious illness and then died only one month before, Mather's inability to explain it is understandable. The court credits his testimony that he was distraught at the time. The court declines to infer that he signed the June, 1995 check for a nefarious purpose.
While the record reflects that Mundinger came to Connecticut in a time of family emergency and then began working closely with Mather in order to help her daughter and Mather, that did not mean that she took on a position adverse to that of her husband. Under Connecticut law, a person may function as a dual agent where there is disclosure and consent, either express or implied. See Zimmerman v. Garvey, 81 Conn. 570, 571,71 A. 780 (1909); United Stone America, Inc. v. Frazier, Lamson,Budlong, P.C., Superior Court, Complex Litigation Docket at New Britain, Docket No. 508999 (January 29, 2002, Aurigemma, J). That Mundinger may have also acted as Mather' s agent does not lessen the apparent authority with which the plaintiff had cloaked her to act on his behalf in accepting M W's payment.
Mather bears no responsibility for the action which Mundinger took after receiving M W's June 16. 1995 check. It is apparent to the court that the plaintiff acquiesced in his wife's depositing the check in her own account. Ultimately, as part of the divorce proceedings, he released her from all claims arising from the loan at issue.
"Imposing a double liability upon an innocent debtor is, in any event, a very serious matter, and one generally denied in all courts of justice. It ought to be and it is the object of courts to prevent payment of any debt twice over." Parker, Peebles Knox, Inc. v. National FireIns. Co., 111 Conn. 383, 394, 150 A. 313 (1930). See also Hospital ofSt. Raphael v. New Haven Savings Bank, 205 Conn. 604, 615, 534 A.2d 1189
(1987). To require another payment from Mather to the plaintiff would be contrary to law. Mather's and M W's obligation to the plaintiff has been discharged.[11]
 CONCLUSION
For the foregoing reasons, judgment may enter for the defendants. It is CT Page 9385 so ordered.
BY THE COURT
ROBERT B. SHAPIRO JUDGE OF THE SUPERIOR COURT