**TD PROPERTIES, LLC and Mario D'Addario Buick–Nissan–GMC, Inc., Plaintiffs,**

v.

**VP BUILDINGS, INC., Varco Pruden Buildings, VP Consolidated Holdings, Inc., LTV Corp., and United Dominion Industries, Ltd., Defendants.**

**No. 3:07CV00629 (DJS).**

United States District Court, D. Connecticut.

March 13, 2009.

d/b/a Mario D'Addario Buick–Nissan–GMC ("Plaintiff")[1] brings this action against the defendant, VP Consolidated Holdings, Inc., n/k/a Varco Pruden Buildings, Inc. ("the Defendant"),[2] alleging a breach of contract, breach of express warranty, breach of implied warranty of merchantability, breach of implied warranty for a particular purpose, and a violation of the Connecticut Unfair Trade Practices Act, Conn. Gen.Stat. §§ 42–110a *et seq.* ("CUPTA"). Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the Defendant has moved for summary judgment on all the claims in the amended complaint. For the reasons that hereafter follow, the Defendant's motions for summary judgment (**dkt. #**s 44 & 65)[3] are **GRANTED.**

Brock Thomas Dubin, Matthew H. Geelan, Donahue, Durham & Noonan, P.C., Guilford, CT, for Plaintiffs.

Curtis L. Brown, Lana Larson Dean, Wright, Fulford, Moorhead & Brown, P.A., Orlando, FL, David S. Hardy, Howard K. Levine, Carmody & Torrance, New Haven, CT, for Defendants.

### MEMORANDUM OF DECISION AND ORDER

DOMINIC J. SQUATRITO, District Judge.

The plaintiff, Mario D'Addario Buick, Inc. and/or Mario D'Addario Buick, Inc.

## I. FACTS

This is a dispute between the owner of a car dealership and a company that manufactures pre-engineered steel structures. At some point prior to February 2003, the Plaintiff entered into an agreement with Nissan whereby Nissan designated the Plaintiff as a "premier" Nissan franchisee/dealership. As a result of this new status, the Plaintiff was required to construct a new showroom to display Nissan vehicles.

The Plaintiff then contacted the Defendant to purchase a pre-engineered steel structure. Because the Defendant only

---

1. Counsel for the Plaintiff filed an amended complaint in which he, with the Court's permission, altered or removed the names of the plaintiffs in this case. As such, there are no longer any claims by or on behalf of "TD Properties, LLC," and "Mario D'Addario Buick–Nissan–GMC, Inc." is now "Mario D'Addario Buick, Inc. and/or Mario D'Addario Buick, Inc. d/b/a Mario D'Addario Buick–Nissan–GMC."

2. Per the parties' stipulation, the claims against all of the other defendants in this case were dismissed.

3. There are two motions for summary judgment because the first motion (dkt. # 44) was filed before the Plaintiff filed its amended complaint, which added the CUTPA claim. The Court allowed the Defendant to file a supplemental summary judgment motion (dkt. # 65) to address the CUTPA claim.

manufactures steel structure kits, it referred the Plaintiff to International Building Systems, LLC ("IBS"), a pre-approved builder that was authorized to erect the structures manufactured by the Defendant. Both parties agree that the Plaintiff signed a standard construction document with IBS on May 07, 2003. The contract called for IBS to construct, under the direction of the Plaintiff's architects, Antinozzi Associates, a showroom with 15,565 square feet in Shelton, Connecticut. Under the terms of the agreement between the Defendant and IBS, the Defendant agreed to manufacture a pre-engineered steel structure according to the specifications provided by the Plaintiff. The Defendant subsequently produced "shop drawings" for approval by the Plaintiff before manufacturing the pre-engineered steel structure. The Plaintiff approved the shop drawings.

The Defendant then manufactured the pre-engineered steel building in accordance with the specifications approved by the Plaintiff. The approved drawings for the pre-engineered steel structure called for supports for two rooftop air conditioning units weighing no more than 600 pounds and 1950 pounds, respectively. IBS installed the two air conditioning units identified in the approved shop drawings. This installation, however, was done in such a manner that the condensate from the air conditioning units drained directly upon the roof.

Moreover, in August 2003, a mezzanine was added to the pre-engineered building by DeLauries Construction. This was done without consulting the Defendant. As a result of this addition, a third air conditioning unit was added to accommodate the mezzanine. This air conditioning unit was placed above the mezzanine area's roof without the Defendant's approval of a change in the loads the structure could support, and it was installed without the appropriate roof curbing needed to mount and support the air conditioning unit. In short, this air conditioning unit was installed in an incorrect manner and caused the roof to leak.

In October 2003, the Defendant sent a field inspector to determine the cause of the leaking roof. In the job site report prepared by the field inspector on October 22, 2003, the field inspector determined that root cause of the roof leaks was that the roof had not been installed in accordance with manufacturer's specifications as outlined in the shop drawings.

IBS replaced portions of the roof between November 2003 and January 2004 because the installation did not meet the Defendant's installation standards for the type of roof panels used on the Plaintiff's showroom. IBS paid for new roof panels that were ordered from the Defendant. IBS did not, however, use the four-inch insulation approved by the Defendant in the shop drawings, but rather used six-inch insulation provided by EJ Davis Company, a local supplier. In addition, while installing the new roof panels, IBS left metal fillings on the roof panels that ultimately contributed to the rusting of the replacement roof.

The plans provided by the Defendant also call for a multi-gutter that was meant to pitch from east to west. The installers from IBS drilled holes for downspouts in the wrong locations and did not install the downspouts with the correct pitch. The installers attempted to correct the problems by patching the holes with tar and putting a vinyl membrane inside the gutter to increase the pitch.

In addition to installing the roof panels and the multi-gutters incorrectly, IBS also installed the roof curbs too low. As a result of this improper installation, when it rains, water pools around the air condition-

ing units and leaks into the interior of the building.

The Plaintiff obtained a quote from American Steel Erectors, a builder that has experience with erecting pre-engineered steel structures, to assess the structure. According to American Steel Erectors, the HVAC units were installed incorrectly; the insulation for the structure was damaged; the roof panels were rusting; and, when HVAC openings were cut, the metal chips rusted on the roof panels, which in turn caused the roof panels to rust.

As construction progressed, all progress invoices submitted by IBS for work performed were paid by the Plaintiff. The final payment for the construction was paid pursuant to an arbitration proceeding because IBS had submitted a claim for final payment and the Plaintiff withheld the final payment, claiming deficient materials and workmanship. The arbitrator found no material or installation deficiencies and awarded IBS the full and final payment plus statutory interest.

The parties agree that the Defendant delivered all the materials and components required for the project. Paragraph nine of the purchase order specifically noted that no agency relation at law or in fact exists between the purchaser and the Defendant. Under the terms and conditions of the purchase order, the Defendant also issued a standard warranty to the end user for the roof panels and the roof panels' finish, provided that the end user adhered to the terms contained in the written warranty.

The Plaintiff claims that, based upon conversations with William Lewis ("Lewis") of IBS, it had a twenty-year warranty for all materials provided by the Defendant and that IBS was going to warrant the labor. The Plaintiff has never sent any written notices to the Defendant re-

garding warranty issues and the Defendant never received any written notices from either IBS or the Plaintiff relating to the warranty claim.

## II. DISCUSSION

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the Defendant moves for summary judgment on all claims in the amended complaint. According to the Defendant, there are no genuine issues of material fact here, and it is entitled to judgment as a matter of law. The Plaintiff maintains that there are genuine issues of material fact that preclude summary judgment.

### A. STANDARD

A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'" *Am. Int'l Group, Inc. v. London Am. Int'l Corp.,* 664 F.2d 348, 351 (2d Cir.1981) (quoting *Heyman v. Commerce & Indus. Ins. Co.,* 524 F.2d 1317, 1319–20 (2d Cir. 1975)).

A dispute concerning a material fact is genuine "'if evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Aldrich v. Randolph*

*Cent. Sch. Dist.,* 963 F.2d 520, 523 (2d Cir.1992) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The Court must view all inferences and ambiguities in a light most favorable to the nonmoving party. *See Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Id.*

## B. BREACH OF CONTRACT

■ It is undisputed that the Plaintiff did not enter into any written contract with the Defendant. Moreover, the Plaintiff does not argue that the Defendant is liable to it pursuant to a direct agreement between the parties. As a general matter, "[i]t is well settled that one who [is] neither a party to a contract nor a contemplated beneficiary thereof cannot sue to enforce the promises of the contract...." *Dow and Condon, Inc. v. Brookfield Dev. Corp.,* 266 Conn. 572, 579, 833 A.2d 908 (2003) (internal quotation marks omitted).

■ The Plaintiff argues, however, that it is entitled to relief as third-party beneficiary. The Court notes that the parties have submitted copies of a number of contracts; however, not all of these contracts are relevant here. To begin with, there is the contract between the Plaintiff and IBS. This contract, though, cannot support the Plaintiff's third-party beneficiary claim because the Plaintiff itself was one of the contracting parties.

■ There is also the general agreement between the Defendant and IBS, whereby the Defendant and IBS established their manufacturer/contractor relationship. This contract, which is governed by the laws of Tennessee, also cannot support the Plaintiff's third-party beneficiary claim. In Tennessee,

a third party is an intended third-party beneficiary of a contract, and thus entitled to enforce the terms of a contract, where (1) the parties to the contract have not otherwise agreed, (2) recognition of the third-party's right to performance is appropriate to effectuate the parties' intent, and (3) terms or circumstances indicate that performance of the promise is intended or will satisfy an obligation owed by the promisee to the third party.

*Benton v. Vanderbilt Univ.,* 137 S.W.3d 614, 618 (Tenn.2004). The agreement between the Defendant and IBS in no way contemplates that either one would somehow be obligated specifically to the Plaintiff here. Moreover, this contract requires all disputes arising under it to be decided by arbitration in Memphis, Tennessee. Thus, if this were the contract pursuant to which the Plaintiff brought its claim, the Plaintiff, under Tennessee law, would have violated the contract because "where [a] contract contains an arbitration clause which is legally enforceable, the general rule is that the beneficiary is bound thereby to the same extent that the promisee is bound." *Id.* (internal quotation marks omitted).

■ This leaves, then, the various material purchase orders that IBS placed with the Defendant. These purchase orders, which are also governed by Tennessee law, include IBS's initial order for the Defendant's materials and the subsequent orders for replacement materials, wherein the Defendant warranted, *inter alia,* that it would provide to IBS goods free from defects. The Plaintiff argues that it is the third-party beneficiary to the purchase orders. The Court has not found much controlling case law directly on point with the issue here. The general rule, however, as seen in the Restatement, is that a property owner, in contracting for the construction

of a building with a contractor who, in turn, has contracted with another entity to supply building materials, is an incidental beneficiary, not third-party beneficiary, of the contract between the contractor and the supplier. *See* Restatement (Second) Contracts § 302 cmt. e (2008) ("A contracts to erect a building for C. B ... contracts with A to supply lumber needed for the building. C is an incidental beneficiary of B's promise, and B is an incidental beneficiary of C's promise to pay A for the building."); *see also* 13 Williston on Contracts § 37:30 (4th ed.); *Cincinnati Ins. Cos. v. Barber Insulation, Inc.*, 946 So.2d 441, 445 (Ala.2006). Therefore, the Court agrees with the Defendant that the Plaintiff is not a third-party beneficiary to the purchase contracts.

■ In addition, even if the Court were to find that the Plaintiff is a third-party beneficiary, the Plaintiff has not presented sufficient evidence to demonstrate that the Defendant violated the purchase orders by supplying defective materials. The problems alleged by the Plaintiff are the following: condensate from the air conditioning units drained directly on the roof; the third air conditioning unit, which was installed without the Defendant's approval, did not have the appropriate roof curbing or support, causing the roof to leak; IBS, when installing the replacement roof panels, used improper insulation, not the insulation from the Defendant; IBS left metal filings on the replacement roof, causing it to rust; the multi-gutter was meant to pitch from east to west, but IBS installed it with the wrong pitch and drilled the downspout holes in the wrong locations; and IBS installed the roof curbs too low, causing water to pool around the air conditioning units and leaks into the building's interior.

In the Court's view, none of the above-mentioned problems are evidence that the Defendant supplied a defective building. In each instance, there is nothing to show that there were defects in the materials supplied by the Defendant. The fact that condensate from the air conditioning units drained directly onto the roof is evidence that their installations were done incorrectly, or possibly that the architectural plans were incorrect; it is not evidence that the building materials were defective. This is especially true with regard to any problems caused by the third air conditioning unit, which was installed without the Defendant's input or approval.

With regard to the Plaintiff's problems with the insulation in the replacement roof panels, the Plaintiff admits that IBS installed incorrect insulation supplied by IBS's subcontractor, E.J. Davis Company, not the Defendant. Indeed, it appears that although the Defendant did supply IBS with the correct insulation, IBS chose not to use it. The Court fails to see how this is evidence that the Defendant supplied defective materials when the Defendant did not supply the materials causing the problem.

With regard to the metal filings that caused the roof to rust, this is evidence that IBS's installation work was faulty, not that the Defendant's materials were defective. The same holds true for the multi-gutter and roof curbs problems, all of which appear to stem from IBS's installation work, not from an inherent defect in the materials supplied by the Defendant. Upon review of the record, there is a complete lack of evidence that could lead a reasonable finder of fact to conclude that the Defendant's product, as supplied to IBS, was defective. Therefore, with regard to the Plaintiff's breach of contract claim, the Defendant's motion for summary judgment is granted.

## C. BREACH OF WARRANTY

The Plaintiff has also alleged that the Defendant breached an express warranty, breached the implied warranty of merchantability, and breached the implied warranty for a particular purpose. The Court finds that these claims fail as a matter of law. As seen in the breach of contract analysis, the Plaintiff's complaints about the building appear to be wholly directed at IBS's workmanship, not the quality of the Defendant's materials.

### 1. Express Warranties

■ The warranty claims also fail for other reasons. With regard to any express written warranty, the record contains the following documents: a brochure for the so-called "Optima Warranty"; a three-year "Standard Warranty"; a twenty-year "KXL Panel Finish Warranty"; and a twenty-year "Galvalume Roof Panel Warranty." The Court sees no evidence that the Plaintiff was covered by the Optima Warranty. The brochure submitted by the Plaintiff contains a description of the Optima Warranty, which is either a ten- or twenty-year warranty that is "available" for some of the Defendant's roof systems, roof curbs, pipe penetrations, and flashing. (*See* dkt. # 51, Ex. 2, pt. E.) It is clear to the Court that a purchaser of the Defendant's products does not obtain the Optima Warranty simply by virtue of the purchase. Indeed, the fact that it can be either a ten- or twenty-year warranty indicates that one must sign up for this warranty and designate its length. In addi-

tion, the brochure states that the Optima Warranty is "available," not inevitable. Thus, although the provisions of the Optima Warranty might have seemed appealing to the Plaintiff, and even persuaded the Plaintiff to use the Defendant's product, it should have been clear to the Plaintiff that the Optima Warranty was optional, not automatic. No reasonable finder of fact could conclude otherwise.

■ The Standard Warranty, KXL Panel Finish Warranty, and Galvalume Roof Panel Warranty present an interesting situation because it does not appear that an authorized agent for the Plaintiff ever signed these warranties. All three warranties provide that they are valid only when signed by the owner (here, the Plaintiff) and the builder (here, IBS). (See *id.*, pts. K, L, & M.) It appears that IBS did sign these warranties, but the Plaintiff did not. Thus, the Court fails to see what effect these warranties would have.

■ Additionally, the Court does not believe that, under the applicable law, namely, the Tennessee Code,[4] the Defendants breached the Standard Warranty, the KXL Panel Finish Warranty, or the Galvalume Roof Panel Warranty. In Tennessee, "[b]reach of an express warranty claimants are exempt from the burden of proving defective or unreasonably dangerous conditions...." *Coffey v. Dowley Mfg., Inc.*, 187 F.Supp.2d 958, 969 (M.D.Tenn. 2002) (citing Tenn.Code Ann. § 29–28–105(a), (c)).[5] "The claim focuses on wheth-

---

4. For whatever reason, both parties in this case consistently have applied Connecticut law to the contracts and warranties at issue even though those documents explicitly state that they are to be governed by the laws of Tennessee.

5. The Court notes that, under Tennessee law, "[i]n all causes of action for ... property damage brought on account of ... breach of warranty, including actions brought under

the provisions of the Uniform Commercial Code, privity shall not be a requirement to maintain such action." Tenn.Code Ann. § 29–34–104. Tennessee courts "use the terms 'property damage' on the one hand and 'economic loss' on the other to describe different kinds of damage a plaintiff may suffer. An action brought to recover damages for inadequate value, costs of repair, and replacement of defective goods or consequent loss of

er a product conforms to the manufacturer's express statements about the product, rather than on whether the product is defective or unreasonably dangerous." *Id.* (citing *Ladd by Ladd v. Honda Motor Co.*, 939 S.W.2d 83, 97 (Tenn.App.1996)).

A "breach of express warranty includes: (1)(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." *Id.* (citing Tenn.Code Ann. § 47–2–313). Thus, "[i]n order to establish a prima facie claim for breach of express warranty, [a] plaintiff must prove: (1) that [the] seller made an affirmation of fact intending to induce the buyer to purchase the goods; (2) that the buyer was in fact induced by the seller's acts; and (3) that the affirmation of fact was false regardless of the seller's knowledge of the falsity or intention to create a warranty." *Id.* (citing *H.B.H. Enter., Inc. v. Cates*, No. 03A01–9608–CV–00253, 1997 WL 76804, at *2 (Tenn.Ct.App.1997)).

 There is no evidence that the Plaintiff had problems with the KXL Panel Finish at all, making the KXL Panel Finish Warranty irrelevant to this case. The

Standard Warranty warrants that the Defendant's goods will be free from defects, and the Galvalume Roof Panel Warranty warrants the Galvalume roof panels will not rupture, structurally fail, or suffer perforation from normal atmospheric corrosion. There is no evidence that the Galvalume roof panels ruptured, structurally failed, or suffered perforation from normal atmospheric corrosion. In addition, there is no evidence that the Defendant's products, as manufactured, were defective.[6] As noted above, the Plaintiff's problems appear to have been caused solely to IBS's workmanship.

 The Plaintiff also alleges that, based upon conversations Lewis, it had a twenty-year warranty for all materials provided by the Defendant and that IBS was going to warrant the labor. Lewis, however, worked for IBS, not the Defendant. IBS was an independent builder authorized to use the Defendant's product. Under the express terms of its agreement with the Defendant, IBS was not an agent or employee of the Defendant, and had no authority to enter into any contract or assume any obligations in the name of the Defendant. (*See* dkt. # 51, Ex. 2, pt. B § 3.4.)[7] Furthermore, the Plaintiff's con-

---

profits is one for 'economic loss.' Property damage, on the other hand, is ... physical harm ... to [user's] property." *Messer Griesheim Industries, Inc. v. Cryotech of Kingsport, Inc.*, 131 S.W.3d 457, 465 (Tenn. Ct.App.2003). In this case, the allegations are that the Defendant's product was defective, for which the Plaintiff seeks recovery. In the Court's view, this is a form of economic loss because the Plaintiff seeks recovery for the value and costs of repair for the allegedly defective goods, i.e., the showroom bought from and built by IBS using the Defendant's materials. There is no indication that the Plaintiff's "other property" (e.g., cars kept in the showroom) were damaged. Instead, the Plaintiff's complaint is about the showroom itself, which, although property owned by the Plaintiff, constitutes the goods at issue.

Therefore, the privity requirement is not waived in this case.

6. The Court notes that, although Tennessee law exempts a plaintiff from the burden of proving defective conditions, he nevertheless must demonstrate that a product did not conform to the manufacturer's express statements about the product. With regard to the Standard Warranty, the express statement about the product was that it would be free from defects. Therefore, the Plaintiff must show that the product did not conform to this statement, i.e., that the product was, in fact, defective.

7. The Court does not believe that the Plaintiff has demonstrated that IBS, despite the language of its contract with the Defendant, was

tract with IBS expressly stated that it represented the entire agreement between IBS and the Plaintiff and superseded all prior written or oral negotiations, representations, or agreements between IBS and the Plaintiff. (*See id.*, pt. C § 6.2.) The contract also provided that IBS, not the Defendant, would warrant the materials furnished under the contract to be of good quality and new. (*See id.* § 8.4.) Given the above, the Court finds that the Defendant is not liable to the Plaintiff for a breach of warranty based on Lewis's representations. Consequently, with regard to the Plaintiff's express warranty claims, the Defendant's motion for summary judgment is granted.

### 2. Implied Warranties

The Plaintiff has also alleged that the Defendant breached the implied warranty of merchantability and the implied warranty for a particular purpose. The Court notes at the outset that the parties are not clear on what is the applicable law to this claim. The parties have generally cited to Connecticut law. The implied warranty of merchantability, however, arises out of a contract for the sale of goods. The goods in question were sold pursuant to the purchase orders discussed above, and those purchase orders are governed by the law of Tennessee, not Connecticut. In any event, regardless of whether the Court uses Connecticut or Tennessee law, this claim fails.

Under both Connecticut and Tennessee statute, the relevant portions of which are essentially identical, a warranty of merchantability is implied in a contract for the sale of goods if the seller is a merchant with respect to goods of that kind. *See* Tenn.Code Ann. § 47-2-314(1); Conn. Gen.Stat. § § 42a-2-314(1). To be merchantable, goods must at least: pass without objection in the trade under the contract description; in the case of fungible goods, be of fair average quality within the description; be fit for the ordinary purpose for which such goods are used; run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; be adequately contained, packaged, and labeled as the agreement may require; and conform to the promises or affirmations of fact made on the container or label, if any. *See* Tenn.Code Ann. § 47-2-314(2); Conn. Gen.Stat. § 42a-2-314(2). Additionally, in Tennessee and Connecticut, where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is an implied warranty that the goods shall be fit for such purpose. *See* Tenn.Code Ann. § 47-2-315; Conn. Gen.Stat. § 42a-2-315

---

an apparent agent of the Defendant. Under both Connecticut and Tennessee law, an apparent agency arises when a principal, through his own acts or inadvertences, creates a semblance of authority in the apparent agent that causes or allows a third person to believe the agent possesses such authority. *See Boren ex rel. Boren v. Weeks*, 251 S.W.3d 426, 432-33 (Tenn.2008); *Tomlinson v. Bd. of Educ.*, 226 Conn. 704, 734, 629 A.2d 333 (1993). One must thus look at the acts of the principal, not the conduct of the agent or the perception of a third party, to establish an apparent agency. *See Boren ex rel. Boren*, 251

S.W.3d at 433; *Tomlinson*, 226 Conn. at 734, 629 A.2d 333. The Plaintiff maintains that, when making an inquiry about purchasing one of the Defendant's buildings, the Defendant referred it to IBS. In the Court's view, this was insufficient to provide IBS with the apparent authority to warrant the Defendant's materials. Manufactures of building materials often do not perform construction projects themselves, but rather contract with builders for that function. This, absent any further act by manufacturers, does not mean that the builders have the apparent authority to warranty the manufacturers' products.

The Plaintiff's claim fails because of its lack of privity with the Defendant. "[T]he rule requiring privity of contract between the parties [is] an essential element of implied warranty ... in Tennessee...." *Leach v. Wiles*, 58 Tenn.App. 286, 429 S.W.2d 823, 831 (1968). In Connecticut, privity of contract is required as well, and is waived only in certain circumstances. *See Hamon v. Digliani*, 148 Conn. 710, 712, 174 A.2d 294 (1961) ("[I]n order to sustain an action for breach of express or implied warranty there has to be evidence of a contract between the parties, for without a contract there [can] be no warranty."); *Kahn v. Volkswagen of Am., Inc.*, No. FSTCV075004090S, 2008 WL 590469, at *7–9 (Conn.Super.Ct. Feb. 13, 2008); *Pro Con Inc. v. Coastal Wall Sys., Inc.*, No. CV040085523S, 2004 WL 2289598, at *2 (Conn.Super.Ct.2004); *see also Garthwait v. Burgio*, 153 Conn. 284, 286, 216 A.2d 189 (1965) ("Where a product is not sold to a plaintiff, there is no privity of contract."). There is no dispute that the Plaintiff and Defendant did not enter into a contract.

The Plaintiff argues, however, that it was in privity with the Defendant because IBS had the apparent authority to provide warranties on behalf of the Defendant. This argument, though, appears to address Lewis's alleged representations to the Plaintiff about an express warranty (namely, a twenty-year warranty on the Defendant's product); it does not address any implied warranties. Moreover, as seen in Footnote 7 above, the Court has already found that this argument, even as it pertained to Lewis's alleged representations, lacked merit.

The Plaintiff also argues that privity of contract is not required when a manufacturer makes representations in its advertisements as an inducement to the ultimate purchaser. This argument, though, is directed to the Optima Warranty discussed above. As the Court has already noted, it was clear from the Defendant's brochure that the Optima Warranty, although inducing the Plaintiff to use the Defendant's product, did not come into effect automatically upon purchase. The brochure stated that the Optima Warranty was "available" for some of the Plaintiff's goods. In addition, because this exception to the privity requirement applies to situations involving representations made in specific advertisements, it is unavailing for the Plaintiff's implied warranty of merchantability or the implied warranty for a particular purpose claims.

The Plaintiff makes the final argument that privity of contract is not required when a Plaintiff has no other avenues for recovery. The Plaintiff cites to caselaw from this District to support this argument. *See Utica Mutual Ins. Co. v. Denwat Corp.*, 778 F.Supp. 592 (D.Conn.1991); *Resnick v. Sikorsky Aircraft, a Div. of United Techs. Corp.*, 660 F.Supp. 415 (D.Conn.1987); *Drescher v. Hoffman Motors Corp.*, 585 F.Supp. 555 (D.Conn.1984); *Quadrini v. Sikorsky Aircraft Div.*, 505 F.Supp. 1049 (D.Conn.1981). The Court reiterates, though, that Tennessee, not Connecticut, law likely applies here.

Nonetheless, even if the implied warranty claims were governed by Connecticut law, *Drescher* and *Quadrini* are distinguishable from the situation here because they both involve personal injury claims and were based on Connecticut Supreme Court cases (*Hamon* and *Garthwait*) that relaxed the privity requirement for breach of warranty claims in personal injury cases. *Utica*, although involving claims of commercial loss, involved a situation where the plaintiff was the insurer in a subrogation claim for a commercial entity that was in privity with the defendant manufacturer. *Resnick* is of little help to the Plaintiff

because, although Judge Dorsey recognized that privity is not required where a plaintiff is left without a remedy, the breach of warranty claims were dismissed.

In addition, those cases stand for the proposition that privity is not required when a plaintiff has no other remedy. All of the cases except for *Drescher* were decided on a motion to dismiss; *Drescher* was decided on a summary judgment motion that was denied without prejudice. Thus, unlike the general situation of those cases, this case does not involve a dismissal of the warranty claims that would leave the Plaintiff without any other remedy. Indeed, the Plaintiff brought claims other than the breach of warranty claims; thus, even if the Court had dismissed the warranty claims for lack of privity, which it did not do (*see* dkt. # 29), such a dismissal would not have left the Plaintiff without any other recourse. At this point, the Plaintiff has had the opportunity to litigate all of its claims, including claims other than the warranty claims. The fact that the warranty claims fail on summary judgment does not meant that the Court deprived the Plaintiff of any other remedy. Thus, the Court finds that the lack of privity is fatal to the implied warranty claims.

Furthermore, the Court again points out that the Plaintiff has presented evidence that IBS's workmanship was substandard, not that the Defendant's product was unfit for its purpose or unmerchantable at the time of sale. Without such evidence, no reasonable finder of fact could find in the Plaintiff's favor. Additionally, the Court doubts that Plaintiff could sustain any implied warranty claims given the fact that the Plaintiff, without the consent or approval of the Defendant, modified the showroom, thus making it difficult to determine the condition of the goods at the time of purchase. Consequently, with re-

gard to the Plaintiff's implied warranty claims, the Defendant's motion for summary judgment is granted.

### D. CUTPA

■ The Plaintiff also brings a CUTPA claim against the Defendant. The original complaint, dated February 27, 2007, did not contain a CUTPA claim. The CUTPA claim was alleged for the first time in the amended complaint, which was filed on July 10, 2008. The Defendant now argues that the CUTPA claim is barred by the applicable statute of limitations.

■ Conn. Gen.Stat. § 42–110g(f), which governs CUTPA claims, provides that "[a]n action under this section may not be brought more than three years after the occurrence of a violation of this chapter." Conn. Gen.Stat. § 42–110g(f). "This statute of limitations is jurisdictional." *Blinkoff v. O and G Indus., Inc.*, 113 Conn.App. 1, 3, 965 A.2d 556 (2009). The Plaintiff admits that the limitations period for its CUTPA claim expired on March 15, 2007. As noted above, the Plaintiff did not bring the CUTPA claims until July 10, 2008. The Plaintiff argues, however, that the CUTPA claim is not time-barred because it relates back to the date of the original complaint, i.e., February 27, 2007.

The Connecticut Supreme Court has explained this relation back doctrine as follows:

> Under our case law, it is well settled that a party properly may amplify or expand what has already been alleged in support of a cause of action, provided the identity of the cause of action remains substantially the same. . . . If a new cause of action is alleged in an amended complaint . . . it will [speak] as of the date when it was filed. . . . A cause of action is that single group of facts which is claimed to have brought about an unlawful injury to the plaintiff

and which entitles the plaintiff to relief.... A change in, or an addition to, a ground of negligence or an act of negligence arising out of the single group of facts which was originally claimed to have brought about the unlawful injury to the plaintiff does not change the cause of action.... It is proper to amplify or expand what has already been alleged in support of a cause of action, provided the identity of the cause of action remains substantially the same, but whe[n] an entirely new and different factual situation is presented, a new and different cause of action is stated.

*Dimmock v. Lawrence and Memorial Hosp., Inc.*, 286 Conn. 789, 798, 945 A.2d 955 (2008) (internal quotation marks omitted). Thus, the Court must compare the original complaint to the amended complaint to determine whether the CUTPA claim relates back to the date of the original complaint.

In the amended complaint, the Plaintiff made the following factual allegations to support the CUTPA claim: (1) that the Defendant or its agent (Lewis of IBS) represented that the showroom would have a twenty-year warranty; (2) that, although the terms of the express warranties provided by the Defendant or its agent (Lewis of IBS) required the Plaintiffs to sign and return the warranties to the Defendant by a specific time, the Defendant or its agents did not provide the Plaintiff with the warranties until after the specified time had passed; (3) that, although the Defendant authored a manual providing that all warranties would be void if the buyer took certain actions or made certain modifications to the product, the Defendant never informed the Plaintiff of those actions that would void the warranties until well after the warranties could not be complied with, and until well after the Defendant undertook such actions; (4) when the Plaintiff sought to enforce the warranties, it was told that the warranties were void; (5) the Defendant or its agent (Lewis of IBS) induced the Plaintiff to buy a building by representing that it came with a twenty-year lease, but then withheld the warranty documents. (*See* dkt. # 63 pp. 13–15.)

Upon review of the original complaint, it does not appear that the Plaintiff included any of these factual allegations. The original complaint notes that the Defendant referred the Plaintiff to IBS for the construction of the showroom, and that the Plaintiff entered into a contract with IBS for that construction. (*See* dkt. # 1 ¶¶ 5–6.) The original complaint then states that from May 2003 to March 2004, IBS erected and installed the showroom pursuant to the Defendant's plans and materials. (*See id.* ¶¶ 7–8.) According to the original complaint, the Defendant expressly warranted, via sales materials, brochures, advertisements, product descriptions, product designs, drawings, and warranties, that the Defendant's products were of superior quality and longevity and otherwise subject to a twenty-year warranty. (*See id.* ¶ 9.) The original complaint goes on to say that the Plaintiff entered into the contract with IBS in reliance on the Defendant's warranties, which the Defendant subsequently breached. (*See id.* ¶ 10.)

The Court finds that, with regard to the CUTPA claim, the amended complaint alleges new facts that create a separate cause of action, which cannot relate back to the original complaint. The original complaint contains no factual allegation that Lewis orally misrepresented the showroom's warranty, nor does the original complaint contain any hint of an allegation that the Defendant or Lewis withheld warranties in order to prevent the Plaintiff from reaping their benefits. CUTPA provides that "[n]o person shall engage in unfair methods of competition and unfair

or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen.Stat. § 42–110b(a). To demonstrate a violation of CUTPA, a plaintiff must show that a defendant's conduct offends public policy, is immoral, unethical, oppressive, or unscrupulous, or causes substantial injury to consumers. *See Ventres v. Goodspeed Airport, LLC,* 275 Conn. 105, 155, 881 A.2d 937 (2005). Unlike the amended complaint, however, the original complaint contains no allegations that the Defendant or Lewis misrepresented the warranties or withheld warranties that the Plaintiff was entitled to have. This was the group of facts upon which the Plaintiff needed to base its CUTPA claim.

 Instead, the original complaint pleads facts that give rise to breach of contract or breach of warranty claims. As pointed out by the Second Circuit, "a simple contract breach is not sufficient to establish a violation of CUTPA...." *Boulevard Assocs. v. Sovereign Hotels, Inc.,* 72 F.3d 1029, 1038–39 (2d Cir.1995); *see Fabri v. United Techs. Intern., Inc.,* 387 F.3d 109, 122 n. 3 (2d Cir.2004) ("We, too, have held that a simple breach of contract does not violate CUTPA and that the plaintiff must show aggravating circumstances."). "A rule to the contrary—that a company violates CUTPA whenever it breaks an unprofitable deal—would convert every contract dispute into a CUTPA violation. We cannot assume that the Connecticut legislature, in enacting CUTPA, intended such an extraordinary alteration of the common law." *Boulevard Associates,* 72 F.3d at 1039. Given the above, the Court finds that the CUTPA claim does not relate back to the original complaint. As a result, the CUTPA claim is barred by the statute of limitations. Consequently, with regard to the Plaintiff's CUTPA claim, the Defendant's motion for summary judgment is granted.

## III. CONCLUSION

For the foregoing reasons, the Defendant's motions for summary judgment (dkt. # s 44 & 65) are **GRANTED. Judgment in favor of the Defendant, VP Consolidated Holdings, Inc., n/k/a Varco Pruden Buildings, Inc., shall enter on all counts of the amended complaint. Because VP Consolidated Holdings, Inc., n/k/a Varco Pruden Buildings, Inc. was the only remaining defendant in this case, the clerk shall close this file.**